(No. 51886.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CHARLES LINDGREN, Appellee.

*Opinion filed February 22, 1980.—Rehearing denied March 28, 1980.*

UNDERWOOD, KLUCZYNSKI, and RYAN, JJ., dissenting.

William J. Scott, Attorney General, of Springfield, and Kenneth E. Boyle, State's Attorney, of Carlinville (Donald B. Mackay, Melbourne A. Noel, Jr., and Anita Donath, Assistant Attorneys General, of Chicago, and Marc D. Towler and Denise M. Paul, of the State's Attorneys Appellate Service Commission, of Springfield, of counsel), for the People.

Richard J. Wilson, Deputy Defender, and Diana N. Cherry, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellee.

Charles Lindgren, *pro se.*

MR. JUSTICE CLARK delivered the opinion of the court:

A jury empaneled in Macoupin County convicted the defendant, Charles Lindgren, of the robbery, armed robbery and murder of Arthur Lewis, age 75. The defend-

ant was sentenced to concurrent prison terms of 6 to 12 years for robbery, 25 to 75 years for armed robbery and 85 to 135 years for murder. He appealed his robbery conviction because it was a lesser included offense in the armed robbery conviction. He also appealed his armed robbery and murder convictions, alleging that two evidentiary errors prevented him from receiving a fair trial. The Appellate Court for the Fourth District vacated the robbery conviction, reversed the convictions for armed robbery and murder because of erroneous evidentiary rulings, and remanded the cause for a new trial. (68 Ill. App. 3d 141.) The appellate court held that the trial court erred in admitting into evidence certain photographs of the victim and evidence that defendant committed an arson after the murder and armed robbery. We agree as to the arson and disagree as to the photographs.

Criminal cases often turn on their particular facts. Accordingly, a summary of the evidence introduced at trial follows. The State's primary witness was Ina Lewis, the defendant's 17-year-old girlfriend of 3½ years. She was the granddaughter of the victim and the niece of the defendant's ex-wife, who also figured prominently in this trial. Ina Lewis originally was charged as a co-defendant. After defendant's trial, however, she pleaded guilty to a lesser offense and was given a substantially reduced sentence.

Miss Lewis testified that on April 17, 1977, the day of the murder, she and the defendant had dinner at his mother's house in Virden at approximately 1:30 p.m. After dinner, at approximately 2:30 p.m., she left with the defendant, who drove to Otter Lake. They arrived around 6 p.m. She said the defendant bought a fishing license there but that they stayed only 15 minutes before going to Girard, in accordance with the defendant's stated desire to visit his children. The defendant's ex-wife had retained custody of his children after their divorce. Girard is located three miles from Virden.

Miss Lewis testified that the defendant dropped her off at a laundromat in Girard at an undetermined time, but returned five minutes later, saying his ex-wife was not at home and that his children were being watched by his ex-wife's sister and mother. The defendant and Miss Lewis then drove to her mother's house in Virden and arrived between 8:30 and 9:30 p.m.

The defendant then announced that he was "going somewhere" and left, telling Miss Lewis she could not accompany him and that he could not tell her his destination. She went to sleep. Between 12:30 and 1:30 a.m., she heard a car horn, went outside and found the defendant all bloody and crying. He told her, she said, that he had "killed Pappy," meaning Arthur Lewis. According to Miss Lewis, an argument ensued between them as to whether she knew where the victim kept his money. He grabbed her arm, she said, and put her in his car, a maroon 1968 Chevy. He was wearing a black jacket, a striped shirt, blue jeans, boots and gloves. These items all had blood on them. They drove to the victim's house in Girard, he pushed her into the house, forced her to look at the victim and accompany him while he searched for money. He used a flashlight in this search. The search was unsuccessful so they left. The defendant stomped the body on the way out. She said the body was very bloody and cut up.

Miss Lewis then testified, over objections, that they left the victim's house at 2 or 2:30 a.m., proceeded to the defendant's ex-wife's house (no one was there), where he again forced her inside. The defendant went to the kitchen, obtained matches, lit a blanket and threw it on the living room couch. He then grabbed a radio and left the house in flames, saying he had informed his ex-wife that he would burn her house down if she was not at home that evening. During the drive back, their car got stuck in a ditch. Passing motorists gave them a ride to Miss Lewis' mother's house. Her mother gave them a ride

to Miss Lewis' grandmother's house. (Her grandmother was separated from the victim.) Defendant threatened Miss Lewis if she breathed a word of these crimes. She said they arrived at her grandmother's house in Virden at 3 or 3:30 a.m. Still under his compulsion and pursuant to his orders, she burned the defendant's shirt and pants and the victim's wallet in a trash barrel outside her grandmother's residence. She also put his boots in the sink and washed them and saw the defendant wash his hands and chest. At this time, they had words over whether she had dated someone else. The defendant also said that he "couldn't live with it," meaning that he could not live with his commission of these crimes. He noted, while pointing to some cuts on his chest, that the victim had put up a fight. He also stated that he had taken $300 from the victim. At that time she saw a blank gun in the defendant's pants.

They both slept until approximately 7 a.m. Then the defendant asked Miss Lewis' mother to take them to a gas station in Girard in order to get his car towed from the ditch. At the second gas station visited, the appropriate arrangements were made. While they were waiting near his incapacitated car, the police arrived and arrested Miss Lewis and the defendant. Just before the arrest, the defendant asked Miss Lewis to "ditch" the blank gun and his own wallet. She put them in a boot underneath the seat in Miss Lewis' mother's car.

On cross-examination, Miss Lewis admitted that after she was arrested she had maintained her and the defendant's innocence until she "became smart" and decided he should not be allowed to get away with it. She said she had never asked her attorneys about the outcome of her own case and that her change in testimony had nothing to do with the disposition of her case. She said that the steering wheel of the defendant's car was never washed although he had driven the car while wearing bloody gloves; that the car keys had no blood on them because he had left the car running during the commission of the

crimes and, therefore, had never touched them; and that his speech was slurred because he was intoxicated from drinking peppermint schnapps.

The defendant's mother corroborated their eating dinner at her home at the approximate time Miss Lewis mentioned. It also was established that the defendant did buy a fishing license at Otter Lake at approximately 6 p.m. In addition, the defendant's ex-wife said she had seen the defendant briefly in a tavern in Girard late that evening and that he was in a bad mood. Miss Lewis' mother agreed that the defendant and Miss Lewis had visited her home around 8:30 p.m. and that the defendant left soon thereafter. She said she heard a car horn at approximately 12:30 a.m. and that Miss Lewis left the home at that time.

A blood specialist testified that the defendant's jacket had blood stains which matched the blood, by grouping and type, of the decedent. This blood type is the same as that of 8.4 percent of the population. The blank gun, recovered by Miss Lewis' father from a boot under the seat of his car, also had this same type of blood on it. Further testimony established that this gun was kept in the defendant's ex-wife's home in their son's room. Only the defendant and his son knew where this gun was kept. Human blood of an indeterminate type was present on some of the $399 found in the defendant's wallet, also recovered from the boot. One $5 bill was stained with blood dissimilar to the defendant and similar to either Ina Lewis or the victim. No blood was found on defendant's boots, car carpet, upholstery, accelerator or steering wheel. Neither Miss Lewis' mother nor the motorists who gave Miss Lewis and the defendant a ride that evening noticed any blood or clothing dishevelment, but the lighting conditions were poor and the hour was late on both occasions.

Several persons had seen a fire in the trash can outside Miss Lewis' grandmother's house at approximately 3:30

a.m. The police recovered the victim's wallet, a brass Levi blue jeans snap and a zipper from this can the next day.

The victim was last seen alive by his son at 8:30 p.m. and was discovered dead by this same son at 6 a.m. the next morning. The victim had died, according to the pathologist, sometime between 1 and 5 a.m. from multiple lacerations, bruises and other injuries inflicted about the head by a black, blunt instrument. A post-mortem amputation of the victim's genitals had taken place. They were recovered from the victim's mouth.

It also was established that the defendant had access to keys which could unlock the victim's house. The defendant told several people he was fishing that evening. He did not testify, however.

The appellate court first held that the trial court erred by allowing extensive testimony about the arson over the repeated objections of the defense. We agree.

Evidence of collateral crimes, *i.e.,* crimes for which the defendant is not on trial, is inadmissible if relevant merely to establish the defendant's propensity to commit crimes. (*Michelson v. United States* (1948), 335 U.S. 469, 475-76, 93 L. Ed. 168, 173-74, 69 S. Ct. 213, 218-19; *People v. Romero* (1977), 66 Ill. 2d 325, 330; *People v. Lehman* (1955), 5 Ill. 2d 337.) Such evidence overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment. We think the arson evidence in this case would tend to overpersuade the jury.

The State, nevertheless, argues that evidence of the arson falls within one of the settled exceptions to the general rule. Our prior decisions have deemed other-crimes evidence admissible if relevant to demonstrate knowledge, intent, motive, design, plan or identification. (*People v. McDonald* (1975), 62 Ill. 2d 448.) The State argues that the arson evidenced a consciousness of guilt within the rule of *People v. Spaulding* (1923), 309 Ill. 292. In that case, the defendant was on trial for

murder, and evidence that he killed the only eyewitness was admitted because it manifested his purpose to avoid detection and constituted an admission by conduct.

There is no support in this record or in common experience, however, to support a similar interpretation of the arson evidence in this case. The State's own witness, Ina Lewis, testified that the defendant told her he burned down his ex-wife's house to punish her for not being at home. This evidence, in the nature of an admission, is vastly more credible than the State's strained interpretation of events. According to the State, the defendant secretly took the gun from his ex-wife's house, used it in the murder and armed robbery, secretly went back inside the house and, instead of simply returning the gun (effectively concealing his use of it), kept it and burned the house down to prevent the discovery that it was missing. Under this theory, the defendant avoided the easiest, self-evident method of concealment and remained unaware that the gun's absence from the debris would be noted because metal does not burn. This theory cannot be maintained.

The evidence instead shows that the defendant did not think of concealing the gun until immediately before his arrest. At that time he had Ina Lewis put it in a boot under the seat of the car in which he was sitting. Because the State's position contradicts the testimony of its own witness and the actions of the defendant himself, and because it assumes, without further evidence, that the defendant was totally unaware of elementary principles of physics, we cannot hold that the arson was probative of a concealment motive or manifested a consciousness of guilt.

The State also contends that the arson evidence was admissible because it established the defendant's presence near the scene of the crime at the approximate time it was committed. The record shows that the defendant's ex-wife's home was located on the other side of Girard,

about six blocks from the victim's house, and that the arson took place at least one or two hours after the murder. Generally, time and place proximity, without more, is an insufficient basis for permitting other-crimes evidence. (*People v. Copeland* (1978), 66 Ill. App. 3d 556, 559.) Often, however, other crimes proximately committed are relevant for additional reasons. (See, *e.g., People v. Wilson* (1970), 46 Ill. 2d 376, 380 (time and place proximity plus relevance to defendant's knowledge); *People v. Armstrong* (1968), 41 Ill. 2d 390, 398 (proximity plus common design or scheme); *People v. Hall* (1967), 38 Ill. 2d 308 (proximity plus confession corroboration); *People v. McGuire* (1966), 35 Ill. 2d 219, 229-30 (proximity plus indication of resistance to arrest); *People v. Walls* (1965), 33 Ill. 2d 394 (proximity plus issue of identity).) The case relied upon by the State, *People v. Tranowski* (1960), 20 Ill. 2d 11, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290, is illustrative of these holdings and inapposite to the instant case.

In *Tranowski,* a series of robberies took place one evening, each minutes apart and in the same immediate neighborhood. The victims of these other crimes identified the defendant and revealed his similar criminal methodology. In the case at bar, a distinct, separate crime was committed. Moreover, as the appellate court noted, Ina Lewis already had testified to defendant's presence at the scene of the crime. She could have established this time and place proximity without mentioning the arson. Since it was Miss Lewis' testimony that also established the arson, it added nothing to the prosecution's case except evidence of another crime. The arson evidence was inadmissible because the same witness could testify to time and place proximity without mentioning a distinct crime only relevant to that proximity. Such a limitation hinders the prosecution in no legitimate way.

For reasons similar to the foregoing, the arson evidence

is not admissible as part of a continuing narrative of crime. This was a distinct crime undertaken for different reasons at a different place at a separate time. *People v. Marose* (1957), 10 Ill. 2d 340, is irrelevant. In that case, evidence that a car was stolen was admissible in a rape trial because the rape was committed in the car. In such cases, without evidence that the car was stolen, the fact finder might conclude that the owner of the car was the perpetrator of the rape. Moreover, that case was tried by the court, not a jury, and the other-crimes evidence was, therefore, less likely to have a prejudicial impact. *People v. Bush* (1963), 29 Ill. 2d 367, *cert. denied* (1964), 376 U.S. 966, 11 L. Ed. 2d 983, 84 S. Ct. 1129, is also irrelevant because there three shootings took place at the same time in the same room and for the same reason.

Other arguments advanced by the State on this issue merit less extensive discussion. First, the arson was not admissible as showing a *modus operandi*. Even assuming, for the sake of argument, that other-crimes evidence was admissible under this theory if it demonstrated a *modus operandi* for concealing relevant evidence, we have determined that the arson in this case, under the evidence produced, was not committed for any concealment purpose. Second, a decision excluding the arson evidence would not invade the province of the jury. Other-crimes evidence cannot be admitted if the grounds for establishing its relevance are speculative. See *People v. Newbury* (1972), 53 Ill. 2d 228, 240.

The most problematic contention of the State is that this error was harmless in view of the overwhelming evidence of guilt. The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal. See the aptly titled book: R. Traynor, The Riddle of Harmless Error 63 (1970).

But preventing a needless retrial conserves judicial resources, promotes the finality of the criminal process, and prevents the prejudice to the prosecution which may

occur if witnesses die, forget pertinent facts, or if the defense were able to change its strategy based upon its increased knowledge of the prosecution's case. (See Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale*, 125 U. Pa. L. Rev. 15, 33 n.62 (1976).) Thus, Supreme Court Rule 615(a) (73 Ill. 2d R. 615(a)) states in pertinent part: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Sometimes the doctrine applies when the error itself was unlikely to have contaminated the jury. (See, *e.g., People v. Butler* (1974), 58 Ill. 2d 45, 48-49 (vague and indirect references to another crime).) As we have seen, however, the extensive discussion of the collateral crime of arson could have influenced the jury to convict him only out of a belief that he deserves punishment. In such cases, a conviction will be upheld only if the properly admitted evidence is so overwhelming that no fair minded jury could have voted for acquittal (see *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290) or, to put it another way, only if the record affirmatively shows that the error was not prejudicial *(People v. Romero* (1977), 66 Ill. 2d 325; *People v. Stadtman* (1974), 59 Ill. 2d 229). Because of the evidentiary ambiguities in this case, we do not think this standard was met.

Ina Lewis said, for example, that the defendant's car keys had no blood on them because the car was kept running, whereas another police officer testified that he saw the defendant in Girard in his car with the engine stopped and the headlights out at 2 a.m. Ina Lewis further testified that the defendant wore his jacket home after the murder, yet that jacket was not burned. The State asked the jury to regard her testimony as mistaken on that point and to infer instead that the jacket was left in the car in the ditch all night. Also, the murder weapon, in the opinion of the pathologist, a blunt, black instrument, was

never recovered. Ina Lewis said she saw a tire tool in the defendant's car and that it was later missing after the defendant got out of his car and walked down some railroad tracks. But police thoroughly searched that area and recovered nothing.

In addition, defendant's boots contained no trace of blood or water when they were recovered, despite Miss Lewis' testimony that they were washed and despite an expert's testimony that she would have expected some blood to be present. Similarly, no blood was found in the defendant's car, despite the presence of much blood on the defendant when he drove it. And the people who saw the defendant and Miss Lewis after the commission of the crime did not notice blood on either of them.

We do not say the defendant is innocent; rather we say that there was evidence to be weighed and witness credibility to be judged. The State even concedes that Ina Lewis' credibility was a crucial issue in this case. And because she was charged originally as a codefendant and undoubtedly nursed hopes of leniency (*People v. Hermens* (1955), 5 Ill. 2d 277, 285-86; *People v. Gleitsmann* (1935), 361 Ill. 165, 169), her testimony must be viewed with distrust on appellate review. See *People v. Wilson* (1977), 66 Ill. 2d 346.

An uncontaminated jury might have examined all of the evidence and concluded that Ina Lewis was a credible witness. We do not think, however, that we should make that determination here. Historically, the jury's function as a fact finder has been jealously guarded, even to the extent of permitting it, by a not guilty verdict, to veto the lawful application of the criminal sanction. (See R. Traynor, The Riddle of Harmless Error 30-33 (1970); *United States v. Martin Linen Supply Co.* (1977), 430 U.S. 564, 572-73, 51 L. Ed. 2d 642, 651-52, 97 S. Ct. 1349, 1355; *Sparf v. United States* (1894), 156 U.S. 51, 39 L. Ed. 343, 51 S. Ct. 283.) This court's recognition of the jury's function to make inferences, weigh conflicting

testimony, and determine witness credibility has been noted too often to require the citation of authority. A statement that appears convincing on the record might appear rehearsed to the jury; a statement appearing awkward and unconvincing on the record may appear sincere and convincing to the jury. We do not think that we should read this record and resolve all of the factual ambiguities against the defendant.

There is also the matter of the integrity of the system. A litigant's right to a trial by an unbiased jury is violated where the jury in fact based its decision on extraneous matters. This is a substantial right normally afforded to guilty and innocent defendants alike. Collateral-crimes evidence is likely to violate this right. Therefore, we hold that the defendant deserves a new trial with a jury unbiased with evidence of the arson.

The appellate court also held that the defendant deserved a new trial because certain photographs introduced into evidence prejudiced him. Since this issue will come up again in the new trial, we also consider it. We disagree with the appellate court. In this case, two pictures of the victim were admitted. One was in color, the other in black and white. Both showed the genital amputation and were taken before the genitals were recovered from the victim's mouth.

Our prior cases have granted trial judges discretion to admit, if they choose, photographs of the victim at the scene of the crime which are probative of any fact in issue. (*People v. Foster* (1979), 76 Ill. 2d 365, 374-78, and cases cited therein.) This has resulted in the admission of photographs as disgusting as those in this case. (*People v. Hoffman* (1965), 32 Ill. 2d 96, 100; *People v. Newbury* (1972), 53 Ill. 2d 228, 242.) Further, the color photograph in this case was probative of the cause of death and the amount of force used in the murder. The black and white photograph was probative of the amount of blood on the premises and the condition of the scene of the crime. They

both also tended to corroborate or not corroborate the testimony of the pathologist, the coroner, Ina Lewis and several other witnesses. Hence, the admission of these photographs, under our prior cases, cannot be deemed an abuse of discretion.

For the reasons given, the judgment of the appellate court is affirmed and the cause is remanded to the circuit court for a new trial.

*Affirmed and remanded.*

MR. JUSTICE UNDERWOOD, dissenting:

Even assuming that evidence of the arson was erroneously admitted, defendant's guilt was so clearly established by competent evidence that the error does not, in my judgment, require reversal. The majority concludes otherwise for reasons which I find singularly unpersuasive.

More important, however, is the persuasiveness of the evidence of guilt. Ina Lewis testified defendant asked her the night of the murder to burn his bloody Levi pants and shirt and a wallet belonging to her murdered grandfather and that she did so. Police examination of the debris from that fire the next day revealed the remains of a wallet containing the grandfather's current driver's license and other of his identification cards, together with teeth from a zipper and three buttons with Levi-Strauss & Company stamped on them. Despite testimony that defendant had said he spent the night in question fishing, his clothing appeared unwrinkled, clean and fresh the next morning. Ina Lewis testified that defendant had cuts on his body which he explained to her by stating that decedent had "put up a fight." Those cuts were also observed during defendant's post-arrest physical examination and seemed fresh. Witness Lewis also testified that defendant told her he "walked into" her grandfather's house, and trial testimony established that stolen keys to the front door of that house were found in a bedroom occupied by Lewis and defendant. A flashlight from defendant's car and

money in his wallet were found to have human blood on them; a jacket defendant was wearing and the starter gun were found to have on them a type of blood similar to the victim's. Hair with microscopic characteristics similar to decedent's was found on defendant's jacket, and hair with microscopic characteristics similar to defendant's was found on decedent's trousers. Ina Lewis testified defendant told her he had taken more than $300 from decedent. After his arrest on April 18 his billfold was found to contain $399, although he was unemployed and drawing unemployment compensation of $63, the latest check having arrived March 8. The only possible explanation of a legitimate source of the $399 was rather implausible testimony by defendant's mother and stepfather as to gifts by her to defendant.

It is not here contended, nor could it be, that the prosecution testimony and evidence, if believed, was insufficient to establish guilt beyond a reasonable doubt. Few rules of law are more firmly established than that which precludes a reviewing court from substituting its judgment as to the credibility of witnesses for that of the jury unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Jones* (1975), 60 Ill. 2d 300, 308.) It seems to me, however, that this is precisely what my colleagues have done, for if Ina Lewis was believed by the jury, as she obviously was, there existed no doubt as to defendant's guilt. As in any vigorously contested two-week trial, there are, as the majority points out, some discrepancies in her testimony. She was, however, substantially corroborated by the other testimony and the physical facts. The proof leaves no real doubt of the defendant's guilt, and I cannot conceive that the jury could have found otherwise, with or without the arson evidence.

If the admittedly erroneous admission of evidence of a murder during an armed robbery trial does not constitute reversible error, and this court so held in *People v. Tranow-*

*ski* (1960), 20 Ill. 2d 11, I cannot agree that the arson evidence, even if erroneously admitted, requires reversal here.

MR. JUSTICE RYAN joins in this dissent.

MR. JUSTICE KLUCZYNSKI, also dissenting:

I agree with Mr. Justice Underwood that, assuming the admission of the evidence of arson was error, it was harmless beyond a reasonable doubt. I would go one step further, however, as I disagree with the conclusion reached by the majority that the evidence of arson was inadmissible.

Our cases have consistently held that evidence which tends to prove a fact in issue is admissible despite its tendency to show that the accused has committed a crime other than the crime for which he is being tried. It has been broadly held that evidence of other offenses is admissible if relevant for any purpose other than to show propensity to commit a crime. (*People v. McDonald* (1975), 62 Ill. 2d 448, 455.) I disagree with the majority's characterization of the arson as a separate and distinct offense unrelated to the commission of the armed robbery and murder of the decedent.

Ina Lewis, granddaughter of the victim, niece of defendant's ex-wife, girlfriend of defendant, and codefendant, testified concerning the sequence of events surrounding this bizarre and brutal homicide. Her testimony, if believed, establishes that defendant, on the one-month anniversary of his divorce from the victim's daughter, murdered his former father-in-law. Her testimony also establishes, if believed, that shortly after this murder, defendant set his ex-wife's home in flames. Despite the closely interwoven relationships among those who figured prominently in the events surrounding the commission of this crime, the majority has found that the arson was a separate and distinct offense, unrelated to the crimes charged. In my opinion, the arson was part

of a continuing narrative so closely connected to the murder that it could be considered part of one continuous transaction. As such, evidence referring to the circumstances surrounding the arson necessarily has relevance to the issue of guilt of the crime charged. *People v. Hall* (1967), 38 Ill. 2d 308, 315.

MR. JUSTICE RYAN joins in this dissent.