(No. 55563.-

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RICH CARLSON, Appellant.

*Opinion filed October 22, 1982.*

GOLDENHERSH and SIMON, JJ., dissenting.

Robert Agostinelli, Deputy Defender, and Stephen Omolecki, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield and James R. May, State's Attorney, of Princeton (John X. Breslin and Kenneth A. Wilhelm, of the State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

Following a jury trial in the circuit court of Bureau County, the defendant, Rick Carlson, was convicted of unlawful delivery of a controlled substance and sentenced to four years' imprisonment. As a consequence of his conviction, the circuit court of Henry County revoked Carlson's sentence of probation for a prior unrelated conviction and sentenced him to a concurrent four-year term of imprisonment. Carlson filed separate appeals from the Bureau County conviction and from the Henry County probation revocation. Since the sole basis for the probation revocation was the unlawful-delivery conviction, Carlson then moved to consolidate the appeals. The appellate court granted the motion and in a split decision affirmed both the judgment of conviction entered by the circuit court of Bureau County and the order of the circuit court of Henry County revoking defendant's probation. 98 Ill. App. 3d 873.

Carlson's defense was alibi. Witnesses for Carlson and for the State gave sharply differing accounts of Carlson's whereabouts on the evening of September 14, 1979, when the unlawful delivery occurred.

The State's case in chief consisted of the testimony of Department of Law Enforcement agent Robert Babczak and forensic chemist Susan Hart Johns. Babczak, an officer with five years' experience as an undercover narcotics agent, testified that he had arranged a controlled purchase of illegal drugs from a person other than Carlson for the evening of September 14, at the Crown Bowling Lanes in Princeton.

Arriving at the Crown Lanes at about 10 p.m., Babczak sat drinking beer in the bowling alley bar, awaiting his prearranged seller. At about 10:45 p.m., Babczak noticed Carlson in the bar area. According to Babczak, Carlson approached him and asked whether he wanted to buy some "downers or acid." After discussing the

price, Babczak agreed to purchase 10 tablets, for which he gave Carlson $30 in advance. Carlson then left the bar area. Approximately 15 minutes later, Babczak also left the bar area to look for Carlson. He found Carlson and a third person, later identified to him as Dan Johnson, in the bowling alley game room. With Carlson looking on, Johnson removed 10 reddish-brown pinhead-sized tablets from a plastic bag, placed them in a second bag, and handed them to Babczak. Nothing was said by any of the three men during this transaction, and no money changed hands. Babczak then returned to the bar to continue waiting for his previously arranged seller.

Ms. Johns, a forensic chemist at the Morton Crime Laboratory, testified that she had examined the tablets given to Babczak and found them to contain lysergic acid diethylamide (LSD).

Five witnesses (Ray Cork, Donald Lewis, Gary Fisher, Greg Jones, and Tammy Wesner), all of whom were acquaintances or friends of Rick Carlson and of each other, testified in his behalf. Their accounts of Carlson's whereabouts on the evening of September 14, 1979, were substantially the same, and differed completely from the State's witnesses'.

On September 12, 1979, a high school classmate and friend of the witnesses and Carlson, Alice McElhinney, had been killed in an automobile accident. After her funeral on Friday, September 14, the parents of the deceased teenager had invited some 50 of their daughter's friends to a gathering at their home. According to the testimony of the defense witnesses, Carlson was with them at the McElhinney residence all evening and was never out of their presence for more than a short period of time (estimates ranged from 10 minutes to half an hour). The McElhinneys themselves did not testify as they were out of the State at the time of trial.

At the McElhinney's, the witnesses testified, they

drank beer and visited with one another and with the McElhinney family. The young people were gathered in the basement den and recreation room and throughout the evening circulated between these two rooms and the beer keg on the patio. "Joints" of marijuana were being passed around, and each of the witnesses admitted smoking from one to three "joints" in the course of the evening. They testified, however, that they were not so affected by the drug as to be unable to perceive what was going on around them.

The five witnesses all testified that Carlson arrived at the McElhinney home between 7:15 and 7:30 p.m., as did most of the guests. Carlson had driven with his girlfriend, Tammy Wesner, in her car, since he did not have an automobile. One witness, Ray Cork, testified that Carlson and Wesner were at the McElhinney's when she (Ray Cork) left the gathering at 11:30 p.m. Other witnesses left at various times between 1:30 and 3 a.m. Their testimony was that the friends, including Carlson, were in each other's company all evening and that Carlson did not leave the McElhinney's. Tammy Wesner testified that Carlson left the gathering at 2:30 a.m.

The State then called witnesses to rebut defense testimony that Carlson was at the gathering at the McElhinney's and therefore could not have been at the Crown Lanes at the time of the unlawful delivery. Agent Babczak testified on rebuttal that 15 to 20 minutes after the drug transaction, which took place at 11:05 p.m., a fight broke out at the bowling alley. Several people, including Babczak and Carlson, attempted to break up the fight. Bureau County deputies arrived some 10 to 15 minutes later and removed one of the disputants, identified as Mike Walters. Carlson followed Walters and the deputies outside, where Walters was put into a squad car. Babczak stated that he observed Carlson speaking to Walters, and that Carlson then told him (Babczak) that

he was going to the jail to see about bond for Walters. Carlson then left, and Babczak returned to his original assignment. Later, some time after midnight, Babczak again saw and spoke to Carlson at the bowling alley.

Bureau County deputies Duane Mechling, Larry Floyd, and Greg Johnson also testified concerning the fight incident. Mechling and Floyd responded to a radio call regarding a fight at the Crown Lanes and took Mike Walters into custody at around 11:30 p.m. The deputies were personally acquainted with Carlson and Walters, and identified them and a number of other persons as having been present at the Crown Lanes or the Bureau County jail, where Mechling took Walters to cool off. Mechling testified that Carlson and another person, Barry Paxton, came to the jail and that Carlson spoke with Walters in the booking room. Mechling released Walters after approximately 30 minutes, and Walters, Paxton, and Carlson left the jail together. Later on his way home Mechling saw Carlson and Walters walking west on Peru Street in the direction of the Crown Lanes.

Deputy Johnson, who had been engaged in surveillance of Agent Babczak from outside the Crown Lanes, similarly testified to Carlson's presence at the bowling alley at the time Walters was taken into custody, and to Carlson's presence at the county jail. He also testified that after he returned to the Crown Lanes shortly after midnight, he observed Carlson and Walters returning there on foot.

There was testimony that it took 5 to 7 minutes to drive the approximately three-mile distance from the McElhinney residence to the Crown Lanes, and approximately 10 minutes to drive from the Crown Lanes to the Bureau County jail.

Since Walters was not formally charged, there was no written police record of the September 14 fight incident.

All three deputies testified that fights at the Crown Lanes were a regular occurrence. Although deputies Mechling and Floyd testified in detail as to the number and the identity of the people present at the fight on September 14, they were unable to recall who had been involved in any of the other incidents, including a fight that occurred the following weekend.

On appeal, Carlson raised three issues. First, he contended that the circuit court committed prejudicial error in permitting the State, over defense counsel's objections, to elicit testimony from a defense witness concerning Carlson's use of marijuana. This occurred when the prosecutor was cross-examining witness Greg Jones about marijuana smoking at the gathering at the McElhinney's, and asked whether Carlson had also smoked marijuana that night. The witness answered, "Yes." An objection by defense counsel was overruled. The State's Attorney then repeated the question, and the witness this time answered, "Probably." Defense counsel again objected and was overruled. Over defense counsel's repeated objection, the prosecutor asked the same question a third time and the witness responded, "No, not really."

The second error asserted was the prosecutor's reference, in closing argument, to other drug transactions supposedly engaged in by the defendant, when no evidence of such offenses had been admitted. On direct examination, Agent Babczak had testified that he had met Carlson on previous occasions and had had discussions with him. The State's Attorney then asked Babczak about the subject matter of the discussions. Defense counsel's objection to the question was sustained. In closing argument the State's Attorney, referring to Babczak's direct testimony, said, "Now Mr. Babczak testified that he had talked to the defendant on previous occasions, that they discussed drugs on previous occasions,

and that the defendant approached him to make the sale." Defense counsel objected, stating that that was not the evidence. The court responded, "The jury heard the evidence."

The third issue raised on appeal was whether the circuit court erred in explaining to the jury its ruling on the inadmissibility into evidence of a letter written by Carlson to a witness while Carlson was in pretrial custody. The letter requested the witness to arrange for another person to testify in Carlson's behalf. In refusing to allow the State's Attorney to question the recipient, Tammy Wesner, about the contents of the letter, the court stated:

> "Quite simply, so the jury will understand, we're not going to get into the constitutional argument here on using of the letter with the U.S. Mail and sensor [sic] of the mail and that sort of thing. So that is why we're doing it."

The appellate court majority agreed with the defendant that the admission of evidence of his unrelated criminal actions was erroneous, and that the prosecutor's misstatement of the evidence in closing argument also was error, but held that the errors were harmless. It did not believe that the circuit court's explanation of its ruling regarding the letter constituted error, but held that even if it were, it too was harmless. We agree with the appellate court that while errors did occur, they were harmless, and we affirm.

As the appellate court correctly held, it was error to allow the prosecutor to elicit testimony concerning unrelated criminal activity of the defendant. Evidence of collateral crimes is inadmissible if relevant only to establish the defendant's propensity to commit crimes. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137; *People v. Romero* (1977), 66 Ill. 2d 325, 330.) Such evidence may be admissible if relevant to show knowledge, intent, motive, design, plan, or identification (*People v. McDonald* (1975), 62 Ill. 2d 448, 455); but the testimony that Carlson had smoked marijuana

at the gathering clearly was not relevant to any of these legitimate purposes.

We also agree that the prosecutor's misstatement of the evidence in closing argument constituted error. It is axiomatic that statements of fact not based on the evidence may not be argued to the jury. (*People v. Beier* (1963), 29 Ill. 2d 511, 517.)

We do believe, however, that any prejudice that might have ensued to the defendant from the prosecutor's misstatement in his closing argument was cured by the court's response that "the jury heard the evidence," together with a later general admonition by the court in the course of the jury instructions that arguments are not evidence.

While Greg Jones was improperly cross-examined concerning Carlson's use of marijuana, we do not think that the jury was prejudiced in view of the witness' equivocation and apparent retraction.

Evidentiary errors like those that have occurred in this case can be labeled harmless only if properly admitted evidence is so overwhelming that no fair-minded jury could reasonably have voted to acquit the defendant (*People v. Lindgren* (1980), 79 Ill. 2d 129, 141; *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290); or as other cases have put it, only if the record affirmatively shows that the error was not prejudicial (*People v. Romero* (1977), 66 Ill. 2d 325, 332).

Positive identification of Carlson was given by undercover narcotics agent Robert Babczak. Babczak testified that Carlson arranged the delivery of lysergic acid diethlyamide (LSD) and received payment for the sale. The alibi witnesses' testimony that Carlson was with them on the night in question was rebutted by several police officers who testified that Carlson was at the scene of the sale after the transaction took place. We find that the properly admitted evidence is so overwhelming that no fair-minded

jury would reasonably have voted to acquit. *People v. Lindgren* (1980), 79 Ill. 2d 129, 141.

Concerning the third alleged error, we note that the correctness of the circuit court's ruling—involving the issue whether the State may introduce, either as substantial evidence or to impeach, a letter written by defendant while in pretrial custody and obtained by the State through censorship by prison officials—was not argued in this or the appellate court, and is not before us. Rather, defendant contends that he was prejudiced by the court's remarks to the jury in excluding the letter, which defendant argues might have tended to lead the jury to believe that evidence probative of defendant's guilt was being withheld from them. At the outset of his attempt to introduce the letter, the State's Attorney stated before the jury that the letter related to Tammy Wesner's motive in arranging for other witnesses to testify for the defendant. In the context of the examination, we do not think the jury could have been misled by the court's comment.

The judgment of the appellate court is affirmed. The judgments of conviction entered by the circuit court of Bureau County and the order of the circuit court of Henry County revoking the defendant's probation are also affirmed.

*Judgment affirmed.*

JUSTICE GOLDENHERSH, dissenting:

I dissent. I do not agree with the majority that the errors here were harmless, and in my opinion the defendant did not receive a fair trial.

It should be noted that only the testimony of Robert Babczak connected the defendant with the sale of LSD. The forensic chemist who testified knew nothing concerning the alleged sale, and the other rebuttal witnesses testified only that defendant was present at the time that a fight occurred. Opposed to this was the alibi testimony of a number of witnesses who had attended the gathering at

the McElhinney residence. This record does not support the conclusion of the majority that the evidence of guilt was overwhelming.

The charge here was possession and delivery of a controlled substance. Although the testimony erroneously admitted concerning defendant's having smoked marijuana might have been harmless under some circumstances, it was extremely harmful in a case involving a controlled substance. The error was exacerbated by the State's Attorney's improper argument and further aggravated by the fact that the court's noncommittal comment could be interpreted to mean that there was evidence to support the prosecutor's comment. Not as important as the other two matters, but notable because of its cumulative effect, is the manner in which the court ruled on the matter of the letter.

In *Duffy v. Cortesi* (1954), 2 Ill. 2d 511, 517, this court said:

"Where error is shown to exist, it will compel reversal, unless the record affirmatively shows that the error was not prejudicial."

This record fails to make that affirmative showing, and I would reverse the judgment and remand the cause for a new trial.

JUSTICE SIMON joins in this dissent.