2016 IL App (3d) 120390

Opinion filed March 21, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2016

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-12-0390 Circuit No. 11-CF-935 |
| WAIL SALEM, | ) ) | Honorable Richard Schoenstedt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Presiding Justice O'Brien and Justice Lytton concurred in the judgment and opinion.

**OPINION**

¶ 1        On July 8, 2010, investigators discovered defendant was in possession of multiple open

Illinois vehicle titles pertaining to various stolen vehicles. Defendant appeals his convictions for

four separate counts of unlawful possession of open vehicle titles.

¶ 2        On appeal, defendant argues the trial court's evidentiary rulings allowing the jury to

consider other crimes evidence both substantively and for purposes of impeachment constituted

reversible error. We reverse defendant's convictions for unlawful possession of open vehicle

titles and remand for a new trial.

¶ 3                                BACKGROUND

¶ 4            On July 8, 2010, the Illinois State Police (ISP) executed a search warrant at defendant's residence. During the execution of the search warrant, investigators discovered defendant was in possession of multiple open Illinois vehicle titles located in a folder containing approximately 40 vehicle titles. Investigators also discovered that three of the four vehicles parked in defendant's driveway, on July 8, 2010, were reported as stolen vehicles.

¶ 5            On May 19, 2011, a grand jury returned a multiple-count indictment against defendant, in Will County case No. 11-CF-935, charging defendant with five, separate, Class 4 felony counts of "Unlawful Possession of Vehicle Title," in violation of section 4-104(a)(2) of the Illinois Vehicle Code. 625 ILCS 5/4-104(a)(2) (West 2010).[1]

¶ 6            According to the State's evidence, introduced during this trial, defendant told the police officers that, for the last seven years, he worked with car dealers who gave defendant vehicles to detail, repair, and sell. Defendant received a commission when a vehicle sold for more than the dealer's bottom-line, designated price.

¶ 7            Defendant's friend, Monther Kofahi, was doing business as Irbid, Inc.[2] According to defendant, Irbid, Inc., obtained the vehicles corresponding to the 40 titles in the seized folder and displayed those vehicles in an Indiana car dealer's showroom. Defendant stated the Indiana dealership "shut down" and Kofahi's vehicles disappeared with the dealer. Kofahi was in the process of trying to repossess those missing vehicles in 2010. When Kofahi left the country to attend his father's funeral, he gave defendant the folder containing the 40 titles so defendant could work with the "repo company."

---

[1]The State eventually *nolle prossed* count III of the indictment.

[2]In another appeal involving the same parties, the transcripts listed the business as "Urban, Inc."

¶ 8        For purposes of clarity, we will discuss the evidence pertaining to each count of the charging instrument separately below.

¶ 9                                    I. Count I

¶ 10       The evidence revealed the first open Illinois title belonged to a 1997 Toyota Avalon XL/XLS.[3]  This title was missing the name and address of the buyer, the odometer reading, and a signature and printed name of the buyer.

¶ 11       According to defendant's pretrial statement to the ISP, this open Illinois title applied to a vehicle that had been scrapped near 147th Street in Chicago.  Defendant stated he used the engine from this scrapped 1997 Toyota to replace a blown engine in a 1999 Toyota he owned. Later, during trial, defendant explained he bought this wrecked 1997 Toyota from a friend, Raja Mahmoud, for $600.  A mechanic swapped that engine into defendant's 1999 Toyota and, approximately two or three weeks later, defendant actually obtained the title for the 1997 Toyota from Mahmoud.  After this repair, defendant sold the 1999 Toyota.

¶ 12                                   II. Count II

¶ 13       The second open Illinois title belonged to a 1985 Mercedes 380SL.[4]  This title was missing the name and address of the buyer, an odometer reading, the printed name of the seller, the printed name and signature of the buyer, and the date of sale.

¶ 14       Before trial, defendant told Trooper Thomas Jennings, the investigating ISP officer, he possessed this second Illinois title because the car was repossessed.  During trial, defendant explained to the jury that he had known George Metry, the owner of this car, for over 20 years, and defendant had loaned Metry $6,200 approximately two years before the trial.  Metry signed over the title, found in defendant's possession, to serve as collateral until Metry repaid the loan

---

[3]People's exhibit No. 3A.

[4]People's exhibit No. 5A.

3

to defendant. Defendant testified Metry's car was in storage at a repair shop in Harvey, Illinois, and he intended to return the title and vehicle to Metry once the debt was paid.

¶ 15                                    III.  Count IV

¶ 16          The third open Illinois title belonged to a 2002 Jeep Grand Cherokee.[5]  This title contained three incomplete assignments of title between dealers.  The first assignment of title was missing the dealer's address and the date of sale; the second assignment of title was missing the dealer address, the dealer number, and the agent's name was illegible; and the third assignment of title was missing the dealership name and address, the dealer number, a date of sale, and the signature of the buyer and seller.  Trooper Jennings testified defendant claimed to have personally purchased this 2002 Jeep Grand Cherokee as a repossessed vehicle and obtained the title through this purchase.  Yet, the Illinois Secretary of State records indicated that a "Michael Wilson" was the registered owner of the 2002 Jeep Grand Cherokee.  However, the face of this third open title listed the owner as "Kenneth Bland," with "Triad Capital Corp." as the lienholder.

¶ 17                                    IV.  Count V

¶ 18          The fourth open Illinois title belonged to a 2003 Chevrolet Trailblazer.[6]  This title showed three assignments of title from dealer-to-dealer.  The first dealer's assignment of title to another dealer was complete and legible.  However, the second dealer-to-dealer assignment was missing the name and address of the buyer, the date of sale, and the odometer reading.  The third dealer-to-dealer assignment was missing the odometer reading, the date of sale, the owner's name, and the printed name and signature of the buyer.  Defendant told Trooper Jennings he

---

[5]People's exhibit No. 7A.

[6]People's exhibit No. 6A.

4

obtained the title to the 2003 Chevrolet Trailblazer from Kofahi and indicated this vehicle was being repossessed.

¶ 19                                      V.  State's Primary Witness

¶ 20        Trooper Jennings, who was employed with ISP and assigned to the Tri-County Auto Theft Task Force, testified for the State and explained to the jury that "title fraud, vehicle theft and vehicle fraud go hand in hand."  He discussed the common practices employed by auto theft rings, stating, "in order to sell a stolen car, [fraudulent] title work many times may be necessary."  The trooper testified that all vehicles have a 17-digit vehicle identification number (VIN) to identify a specific vehicle: one VIN is placed in public view; the same VIN is placed in a "confidential view" stamped somewhere in the main frame of the vehicle; and the same VIN is electronically stored in the vehicle's computer.

¶ 21        The trooper testified that criminals often steal a vehicle, tamper with and replace the public VIN with a fraudulent VIN, and have counterfeit titles bearing the fraudulent VIN issued in the name of a new owner.  Sometimes the confidential VIN on the frame of the car is also defaced so it cannot be compared to the fraudulent public VIN.  In some situations, the electronic VIN is altered.  In addition, sometimes "retagging" or "cloning" vehicles occurs when a stolen vehicle is given a different VIN that is obtained from a similar vehicle that has been wrecked and sold with a salvage title.  The criminals will then swap out the VIN from the wrecked car, transfer it to the stolen car, and sell the car to an innocent buyer.

¶ 22        The trooper testified repossession of vehicles is another common method used by auto theft rings.  In this situation, a thief pretends to have the authorization of a lienholder to repossess a vehicle and seizes a vehicle without authority.  Once a vehicle is seized or stolen using this method, the criminal tampers with the title or forges a new title in order to sell that vehicle to an innocent third party for a substantial profit.  Trooper Jennings explained that

5

Indiana, Ohio, Georgia, and Alabama are states that have fewer restrictions than Illinois for obtaining new titles to vehicles.

¶ 23     Prior to Trooper Jennings' testimony, the prosecutor initially requested permission to introduce a limited amount of "other crimes evidence" regarding the stolen status of, and fraudulent VIN's for, two vehicles parked in defendant's driveway on July 8, 2010: a white Navigator and a black Mercedes.[7] The defense objected because these two vehicles did not correspond to any open titles at issue, and the vehicles listed in the open titles were not reported as stolen. After balancing whether the other crimes evidence would be "more prejudicial than probative," the court found the nexus between the proposed other crimes evidence and the pending open title charges were "so intertwined and connected potentially and it does go to show mental state."

¶ 24     Over the defense's continuing objection, the court permitted the State to introduce testimony that the white Navigator and the black Mercedes were stolen vehicles according to the "National Insurance Crime database." In addition, the jury received photographs depicting the public VIN's for the white Navigator and black Mercedes did not match the confidential or electronic VIN's for each vehicle. The court allowed the State to present additional other crimes evidence pertaining to a maroon BMW and a black BMW, also parked in defendant's driveway, on July 8, 2010.[8] The maroon BMW had one current Illinois title showing a lienholder and one current Indiana title showing no lienholder. Therefore, one or both of those titles may have been fraudulent.

---

[7]The State initially asked to admit only People's exhibit Nos. 4A, 4B, 4C, 4D, and 4E that corresponded to these two uncharged vehicles.

[8]People's exhibit Nos. 4H, 8, 9, and 11 pertained to the maroon BMW; People's exhibit Nos. 4J, 4K, 4L, 12, and 14 pertained to the black BMW; and People's exhibit Nos. 15, 16, and 17 pertained to the white Navigator.

¶ 25     The black BMW had an Indiana dealer license plate. Yet, according to Illinois Secretary of State records, the black BMW was registered to an Illinois resident, who reported his BMW was stolen from Westmont, Illinois. With respect to the black BMW, Trooper Jennings said defendant told him he had a certificate of title from Alabama for this black BMW. However, the trooper informed the jury that the black BMW was not registered in Alabama. Additionally, the trooper located an Alabama title for the white Navigator, which was not registered in Alabama.

¶ 26     Trooper Jennings interviewed defendant at the Will County jail on July 14, 2010. Defendant said he was in the process of selling the white Navigator for a person named "Durgam," who had also given him the black BMW. Later, defendant admitted he lied about "Durgam" giving him the black BMW, and claimed a guy named "Charlie" provided him with the black BMW located in his driveway.

¶ 27                              VI. Defendant's Phone Calls

¶ 28     Albert Michael, a linguistics specialist who was fluent in Arabic, Assyrian, and English, testified ISP asked him to translate an audio CD containing approximately 20 separate phone conversations, involving defendant, from the Will County jail. In one conversation, defendant's wife told defendant that the police said the white Navigator was stolen and there were problems with the paperwork for the three other vehicles in the driveway. During this conversation, defendant told his wife to take "the black car" immediately to "Ashraf" to hide, because it "will cause me problems." Defendant advised his wife that the cars in the driveway were not stolen. In another telephone conversation, defendant spoke to "Ashraf" and told "Ashraf" there were problems with the titles to the vehicles taken by the police and to hide the black BMW.

¶ 29     At the close of the State's evidence, defendant moved for a directed verdict, which the court denied. The court next proceeded to the jury instructions conference, where the State tendered People's instruction Nos. 1 through 20. The court allowed People's instruction No. 8,

over defendant's objection. People's Instruction No. 8 instructed the jury that they could use defendant's prior convictions for purposes of impeachment.

¶ 30                                   VII. Defense Evidence

¶ 31       Defendant's wife, Amal Salem, testified that, on July 8, 2010, the police told her they took the cars to "check up on them." She recalled a conversation where defendant told her to hide the black car, but she thought he meant to keep the car so the family had one vehicle to use.

¶ 32       Defendant testified he was 46 years old, married to Amal, a United States citizen, and had resided in this country since 1985. After the court ruled defendant's prior convictions were admissible for impeachment purposes, defendant testified he had a 1999 federal conviction. Defendant also admitted he had another 2010 Cook County charge to which he pled guilty in 2011. After discussing the circumstances surrounding the open titles listed in counts I, II, IV and V of the indictment, defendant stated he kept the folder with all of the titles in his bedroom. Defendant testified the folder was never located in one of the cars on his property, where the police claimed it was recovered. Defendant said he did not know whether Kofahi had returned to the United States or remained out of the country at the time of defendant's arrest.

¶ 33                                   VIII. Rebuttal

¶ 34       For purposes of impeachment, over the defendant's objection, the State read to the jury details of the 11 felony convictions, entered in 1999, from federal case No. 96-CF-781, which included: five counts of fraud, four counts of food stamp program violations, one count of identity document fraud, and one count of obstructing or impeding an IRS investigation. The State also advised the jury that defendant pled guilty to three charges, in Cook County case No. 10-CF-598401, on May 16, 2011, for the following felony offenses: "Class 1 felony, theft over 500,000; Class 1 felony, theft over 500,000; Class 1 felony theft, unauthorized control 100,000 to 500,000." However, in denying defendant's motion for mistrial, the court admonished the

8

jury that defendant only plead guilty to one Class 1 felony theft count, over $500,000, in this Cook County case. The Cook County court had not sentenced defendant on this charge at the time of defendant's trial.

¶ 35                                    IX. Posttrial

¶ 36        On December 1, 2011, the jury returned verdicts of guilty on counts I, II, IV, and V of the indictment relating to the four open Illinois titles. The court found extended-term sentencing applied. On February 27, 2012, the court sentenced defendant to serve four and one-half years in the Illinois Department of Corrections; each count to be served concurrently, but consecutively with defendant's 2010 Cook County case.

¶ 37        The court then admonished defendant that, if he chose to appeal the convictions or sentences, he had to first file a written posttrial motion, within 30 days of the sentencing date. In that motion, the court told defendant he had to specifically list the issues he wanted addressed, and any issue not raised in that motion would be deemed waived. The court, without objection by the State, granted defendant leave to file a motion for new trial.

¶ 38        On March 26, 2012, defendant filed a "Post-Trial Motion," requesting a new trial. In part, defendant alleged the State presented extensive substantive evidence of other crimes "for the express purpose of influencing the jury to find [defendant] guilty of possession of car titles in spite of having lawful and non-criminal purposes for possessing open car titles." On April 9, 2012, the trial court denied defendant's motion for new trial "in all respects." Defendant filed a notice of appeal on May 9, 2012, the 30th day after the court's ruling.

¶ 39        This court issued a decision dismissing the appeal on the grounds that defendant's notice of appeal, filed on May 9, 2012, was not "timely." Noting that defendant's motion for new trial was not timely filed within 30 days after the December 1, 2011, verdict, we concluded the untimely posttrial motion did not toll the time for filing a notice of appeal within 30 days of

9

defendant's sentence on February 27, 2012. *People v. Salem*, 2014 IL App (3d) 120390-U. Upon review, our supreme court exercised its supervisory authority to reinstate defendant's appeal and directed this court to vacate our prior decision dismissing the appeal and address the merits of the issues raised in defendant's appeal. *People v. Salem*, 2016 IL 118693. Accordingly, we vacate our prior order dismissing this appeal in *People v. Salem*, 2014 IL App (3d) 120390-U.

¶ 40                                          ANALYSIS

¶ 41        In support of a request for a new trial, defendant raises two issues on appeal. First, defendant contends the court abused its discretion by allowing the jury to substantively consider other crimes evidence to prove defendant's criminal intent while possessing the four open Illinois titles. Second, based on plain error, defendant argues the court abused its discretion by allowing the State to impeach defendant's credibility with the federal convictions more than 10 years old. Defendant submits this error was further compounded when the court also allowed the jury to consider defendant's Cook County guilty plea, for purposes of impeachment, which had not become a final judgment pending the imposition of sentence by the Cook County court. We address plain error and impeachment first.

¶ 42                          I. Impeachment by Prior Conviction

¶ 43        Defendant argues the trial court committed reversible error by allowing the State to impeach defendant's credibility with his certified 1999 federal fraud convictions and the certified copy of the docket sheet showing defendant's guilty plea in the 2010 Cook County case. Since defendant did not preserve this error in a posttrial motion, we must consider whether plain error applies. Before applying plain error, we must determine whether any error occurred.

¶ 44        The State concedes, in its appellate brief and during oral argument before this court, that the State did not present sufficient evidence regarding the 1999 federal convictions to meet the

10

strict 10-year requirement as set forth in Rule 609(b) of the Illinois Rules of Evidence.[9] Ill. R. Evid. 609(b) (eff. Jan. 1, 2011); see also *People v. Yost*, 78 Ill. 2d 292, 297 (1980). Therefore, it is undisputed the trial court erred by allowing the State to present these 11 federal convictions to the jury to impeach defendant's credibility.

¶ 45    Next, defendant contends the trial court also erred by allowing the State to impeach defendant's credibility with proof of a guilty plea for the 2010 Cook County charge because the guilty plea had not resulted in a sentence and final judgment of conviction. Although there is no Illinois case law directly on point, we recognize that, while a guilty plea is an admission of guilt, such an admission of guilt does not become a final judgment of conviction until the court imposes a sentence, either by agreed disposition or following a sentencing hearing. Both section 2-5 of the Criminal Code of 1961, defining a conviction (720 ILCS 5/2-5 (West 2010)), and section 102-14 of the Code of Criminal Procedure of 1963, defining a judgment (725 ILCS 5/102-14 (West 2010)), must be considered together to resolve this issue. The Criminal Code of 1961 states:

> " 'Conviction' means a judgment of conviction or sentence entered upon a plea of guilty or upon a verdict or finding of guilty of an offense, rendered by a legally constituted jury or by a court of competent jurisdiction authorized to try the case without a jury." 720 ILCS 5/2-5 (West 2010).

Next, section 102-14 of the Code of Criminal Procedure of 1963 defines judgment, as follows:

> " 'Judgment' means an adjudication by the court that the defendant is guilty or not guilty and *if the adjudication is that the defendant is guilty it includes the*

[9]The State does not concede that this error amounted to reversible or plain error.

*sentence pronounced by the court.*"  (Emphasis added.)  725 ILCS 5/102-14 (West 2010).

Further, our supreme court has long established that the final judgment in a criminal case is the sentence (*People v. Allen*, 71 Ill. 2d 378, 381 (1978) (citing *People v. Warship*, 59 Ill. 2d 125, 130 (1974)), and a defendant cannot appeal his criminal case until final judgment is entered (Ill. S. Ct. R. 606(b) (eff. Mar. 20, 2009)).

¶ 46    We have found one case in Illinois addressing what constitutes a "conviction" for purposes of impeachment of a defendant during a criminal trial.  In *People v. Lashmett*, the court held that only convictions may be proved for impeachment purposes, and proof of arrests, indictments, charges, or actual commission of a crime were not admissible.  *People v. Lashmett*, 126 Ill. App. 3d 340, 345 (1984).  The *Lashmett* court held that a conviction contemplated more than a "mere finding of guilt."  *Id.* at 346.  *Lashmett* is potentially distinguishable because that case held that a *jury's* verdict of guilty did not constitute a conviction for purposes of impeachment.  However, the *Lashmett* court was not asked to determine whether a judge's finding of guilt, based on a guilty plea, would require the same result.  *Id.*  In fact, this court has previously held, in a civil case, a witness could not be impeached with a prior "conviction" before being sentenced in her criminal case.  *In re Estate of Kline,* 245 Ill. App. 3d 413, 430-31 (1993) (citing *People ex rel. Grogan v. Lisinski*, 113 Ill. App. 3d 276, 281 (1983)).

¶ 47    Based upon our review of the Cook County record, we conclude defendant's guilty plea did not constitute a conviction for purposes of impeachment.  Consequently, the trial court erred by allowing the jury to consider the Cook County guilty plea.

¶ 48    In *People v. Glasper*, our supreme court equated the second prong of plain error review with structural error, asserting that "automatic reversal is only required where an error is deemed 'structural,' *i.e.*, a systemic error which serves to 'erode the integrity of the judicial process and

12

undermine the fairness of the defendant's trial.' " *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009) (quoting *People v. Herron*, 215 Ill. 2d 167, 186 (2005)). An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or is an unreliable means of determining guilt or innocence. *People v. Thompson,* 238 Ill. 2d 598, 609 (2010); *People v. Williams*, 409 Ill. App. 3d 408, 413 (2011).

¶ 49 Here, the State concedes the jury should not have been informed that defendant had 11 prior convictions for federal fraud charges and should not have considered those convictions for purposes of impeachment. Further, this court now concludes the admission of defendant's 2011 guilty plea, in the 2010 Cook County case, for purposes of impeachment was also incorrect. Without the 11 federal convictions and the 2011 guilty plea, the State could not properly urge the jury, as instructed by the court, that defendant's credibility was weakened by his prior convictions for these particular 12 offenses. Consequently, we conclude the admission of this improper evidence of impeachment by prior conviction was so egregious that it eroded the integrity of the judicial process and rendered defendant's trial fundamentally unfair. Hence, we also reject the State's contention that the conceded error, with respect to these convictions, was harmless. Therefore, we conclude defendant is entitled to a new trial and reverse defendant's convictions due to the court's erroneous evidentiary ruling on the issue of proper impeachment.

¶ 50                                    II.  Other Crimes Evidence

¶ 51 Next, defendant contends the trial judge abused his discretion by allowing the State to introduce extensive other crimes evidence pertaining to the possession of stolen vehicles, rather than limiting the State to the admission of evidence for the multiple charges based solely on open Illinois vehicle titles. The defense argues that "the excessive evidence presented by the State as to a number of uncharged offenses [related to the unlawful possession of stolen vehicles] presented a disconcerting risk of overpersuading the jury that defendant was a bad person who

13

deserved punishment." Therefore, defendant requests a new trial. The State submits the other crimes evidence was probative to show defendant possessed the four open Illinois titles with the requisite criminal intent.

¶ 52     Although we have reversed defendant's convictions on other grounds, we address the merits of this other crimes issue because the same issue is very likely to arise during the new trial following remand. Generally, Illinois courts prohibit the admission of other crimes evidence to protect against the jury convicting a defendant because he is "a bad person deserving punishment." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). However, in special situations, other crimes evidence may be "permissibly used to show, by similar acts or incidents, that the act in question was not performed inadvertently, accidently, involuntarily, or without guilty knowledge." *People v. Wilson*, 214 Ill. 2d 127, 136 (2005).

¶ 53     It is well established that, even if other crimes evidence is admissible as evidence of intent or absence of mistake, the court must exclude the other crimes evidence if "the prejudicial effect of the evidence substantially outweighs its probative value." *Donoho*, 204 Ill. 2d at 170 (citing *People v. Illgen*, 145 Ill. 2d 353, 365 (1991)). The admissibility of evidence, including other crimes evidence relevant to intent, rests within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *Wilson*, 214 Ill. 2d at 136; *Donoho*, 204 Ill. 2d at 182. This court will not find the trial court abused its discretion unless the court's decision is unreasonable, arbitrary, or fanciful, or if no reasonable person would adopt the trial court's view. *Donoho*, 204 Ill. 2d at 182.

¶ 54     Courts have held that the underlying rationale for making other crimes evidence objectionable is not because "it has no appreciable probative value, but because it has too much"; and "[t]he law distrusts the inference that because a man has committed other crimes, he is more likely to have committed the crime charged." *People v. Kimbrough*, 138 Ill. App. 3d 481, 484

14

(1985). Further, Illinois courts have warned against the dangers of putting on a " 'trial within a trial,' " presenting other crimes evidence with such detail and repetition that it greatly exceeded what was necessary to establish the particular purpose for which the evidence was admitted. *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006) (quoting *People v. Bartall*, 98 Ill. 2d 294, 315 (1983)). Such a trial within a trial occurred in the case at bar.

¶ 55    Turning to the evidence, on one hand, the State's other crimes evidence allowed by the court included strong circumstantial evidence that defendant knowingly possessed a stolen black BMW. This evidence included the State offering evidence showing defendant, when calling his wife from the jail, directed his wife to hide the black BMW from the police immediately because it would "cause [him] problems." Although defendant told his wife, during this conversation, that the vehicles were not stolen, this evidence suggests at the very least that defendant might have suspected the black BMW was stolen.

¶ 56    However, defendant did not make any incriminating statements to his wife or anyone else suggesting he had similar concerns about the ownership of other vehicles, including the white Navigator and black Mercedes. Nonetheless, the court did not limit the other crimes evidence to the black BMW. Instead, the court allowed the State to indulge in prosecutorial overkill by informing the jury that the white Navigator and black Mercedes, parked in defendant's driveway, were also stolen.

¶ 57    Further, the State's undisputed evidence established the four open titles corresponded to a 1997 Toyota Avalon XL/XLS, a 1985 Mercedes 380SL "Roadster," a 2002 Jeep Grand Cherokee, and a 2003 Chevrolet Trailblazer. These four open titles belonged to vehicles that

15

were *not* reported as stolen.[10] Similarly, unlike the white Navigator and the black Mercedes, the vehicles subject to the open titles were *not* parked in defendant's driveway.

¶ 58    Here, the jury received four times the amount of evidence for the uncharged crimes of possession of stolen vehicles, when compared to the four exhibits directly related to the open title offenses at issue. These four exhibits related to the open title charges directly corresponded to counts I, II, IV, and V of the indictment, and the open titles corresponding to each count were marked and introduced into evidence as People's exhibit Nos. 3A, 5A, 7A, and 6A, respectively.

¶ 59    In contrast, the jury received 17 exhibits to examine and consider concerning the *uncharged* crimes related to defendant's alleged knowing possession of multiple stolen vehicles parked in his driveway. In this case, due to prosecutorial zealousness, the jury may have convicted this defendant solely because the jury concluded he was a thief or a "bad person deserving punishment." *Donoho*, 204 Ill. 2d at 170; *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980). This level of overpersuasion is the reason other crimes evidence must be strictly limited by the court. Therefore, due to the unique circumstances in the case at bar, we conclude the trial court abused its discretion by allowing the State to introduce unlimited other crimes evidence as proof of, in the court's words, defendant's "mental state."

¶ 60    Additionally, defendant argues on appeal that, during the testimony, the jury did not receive a proper limiting instruction from the court regarding the limited use of the other crimes evidence, as recommended by the Committee Notes for the "Proof Of Other Offenses Or Conduct" jury instruction (Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000)). However, we do not reach this issue because of our ruling that the other crimes evidence is inadmissible.

---

[10]In its appellate brief, the State concedes none of the vehicles found in defendant's driveway, including the black Mercedes, corresponded to the vehicles listed in the open title charges in the instant case.

16

¶ 61                          CONCLUSION

¶ 62          For the foregoing reasons, we reverse defendant's convictions, vacate his sentences, and

remand this case to the circuit court for a new trial.

¶ 63          Reversed and remanded.