THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID D. GOVAN, Defendant-Appellant.

Fourth District No. 4—87—0621

Opinion filed April 28, 1988.

332

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald D. Bernardi, State's Attorney, of Pontiac (Kenneth R. Boyle, Robert J. Biderman, and J. A. C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

On June 23, 1987, in the circuit court of Livingston County, defendant David Govan was found guilty by a jury of the offense of unlawful use of weapons by a felon in violation of section 24—1.1 of

the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1985, ch. 38, par. 24—1.1). On August 31, 1987, defendant was sentenced to six years' imprisonment in the Illinois Department of Corrections, with said sentence to be served consecutively with his current sentence. Defendant appeals alleging (1) the court erred by refusing to instruct the jury on the defense of necessity; (2) the court erred on two evidentiary rulings; (3) defendant received ineffective assistance of counsel; and (4) the court abused its discretion in sentencing defendant.

On April 29, 1986, defendant was charged with the offense of unlawful use of weapons by a felon in violation of section 24—1.1 of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 24—1.1). This section provides that possession of a weapon by a convicted felon is a Class 3 felony, but, if the possession occurs while the person is confined in a penal institution, it is a Class 1 felony. The indictment alleged that on February 19, 1986, defendant possessed a dagger-like weapon after defendant had been convicted of a felony and while he was confined in a penal institution. The jury trial commenced on June 22, 1987.

The State's first witness was Joseph Kuntz who, on February 19, 1986, was employed as a lieutenant by the Department of Corrections at the Pontiac Correctional Center (Pontiac). Around 9:30 p.m. on that date, he and Lieutenant Thomas Moyer proceeded to shakedown defendant's cell, looking for a calculator. Kuntz patted down defendant and discovered a "shank" hidden in his sock. This shank was a round rod approximately three-eighths of an inch in diameter and 10 to 14 inches long. A further search of the cell uncovered another shank found in the bunk. This shank was a flat piece of metal 1 inch in diameter and 10 to 14 inches long with a sharpened end. Kuntz estimated that over the six-year period he worked at Pontiac, he saw several hundred weapons like this.

Thomas Moyer has worked as a lieutenant at Pontiac since 1983. He testified he was with Kuntz at the time of the search and observed him find the shank on defendant. He was also present when the other shank was found. The State then introduced a certified copy of defendant's felony conviction and rested.

Defendant testified he was sentenced to 28 years' imprisonment in June 1984 after receiving convictions for murder and attempted armed robbery. He previously had served two years in Pontiac for an armed robbery conviction in 1977.

Defendant acknowledged he possessed the shank but stated he needed to do so to protect himself. He explained he had received a "threatening" note that warned he could not live in Pontiac without being in fear of his life. This note had come from members of the

Vice Lords gang. He explained that at the time of the murder offense he belonged to the Black Disciples gang. He murdered a CTA policeman who was receiving payments from the Vice Lords and allowing the gang to operate their drug business.

Defendant is 6 feet 2 inches tall and weighs 165 pounds. He stated he needed to carry a shank because the majority of inmates carry them. Usually, if the other inmates know you have one, they will leave you alone. He stated the inmates believe it is better to be caught with a shank than without one.

Defendant stated that if he went to the authorities with the problem they would only put him in protective custody. He testified he did not want to go there for a number of reasons. He believed that he would not be any safer there than in the general population. He stated that he would also have to stay locked up most of the day. He would not be able to go to the yard for exercise or attend school or take up a trade. Defendant is currently taking classes through Lincoln College.

Defendant stated there are currently 11 to 12 gangs in Pontiac. The gangs do not get along. Also, grudges started out on the streets are carried over to prison. Defendant was afraid for his life. He stated there are not many guards, and, usually, once a fight commences, they will get out of the way.

Another reason he did not want to go into protective custody was that the inmates regard it as less than manly. The other inmates refer to them as females.

On cross-examination, defendant admitted he did not keep the note nor did he tell anyone about it. Defendant stated he had the knife for six to eight weeks before it was confiscated. When asked whether he would rather be locked in a cell 24 hours a day for his protection or carry a knife, defendant responded that he would rather be a man and stand up to the problems he has rather than run from them. He also acknowledged he never knew who sent the note, nor did anyone in particular threaten him. He admitted the other shank was his also. He had two in case he lost one during a search.

On the second day of the trial, defendant retook the stand. He stated first that he procured the knives one or two days after receiving the note. He acknowledged telling an investigator on March 3, 1987, that he received the note three to four weeks before he was apprehended with the knife. He also maintained he procured the knife seven to eight weeks before his discussion with the interviewer.

Defendant next called Moyer as his witness. Moyer described Pontiac and the procedures used there. He stated that on day shifts

there are usually six officers responsible for about 450 men. It is not unusual for there to be physical attacks by the inmates on each other. If a fight breaks out, a guard is to call for help and then try to deal with the problem. The guard is not supposed to try to break the fight up because he is the one who will be injured.

He testified that inmates in protective custody are kept separate from the general population. He acknowledged it is not 100% safe, but stated it is a lot safer than being in the population. He estimated 99% of the inmates in protective custody are not injured in any way. There are currently 300 to 350 inmates in protective custody. The total inmate population is 1,300 to 1,600 inmates.

The guards try to keep control of the inmates by periodically searching for weapons. However, if the inmates know they are going to be searched, they will dump their weapons. One time the guards recovered 118 weapons dumped from a group of approximately 450 inmates.

Defendant's final witness was Richard Irvin, an investigator at Pontiac. He has been there since 1984. In that time, there have been two homicides involving inmates. Neither of these occurred in protective custody. He acknowledged there have been many more attacks resulting in injuries.

On rebuttal, the State called Wilber Simpson, a captain at Pontiac. He worked at Statesville Correctional Center from 1979 to 1984 and at Pontiac since that time. He has never seen a death of an inmate while in protective custody at either institution. He acknowledged there are fist fights but maintained there are very few serious assaults. While in protective custody, inmates have access to most of the same programs as the general population.

When an inmate requests protective custody, he is immediately taken to the security wing. After the inmate makes the request, he never returns to his cell. If there is a problem with putting him in the protective custody unit, the inmate will be immediately transferred to another unit. Most of the inmates do not like to go into the unit. In fact, some think it is a crime to be in there.

Upon completion of the evidence, defendant submitted jury instructions including the affirmative defense of necessity. The court refused the instruction and directed defense counsel not to argue that a legal defense of necessity existed. However, the court did indicate that counsel could argue necessity as an excuse for defendant's behavior. Counsel believed it would be unethical for him to so argue if the instruction was not going to be given. He, therefore, waived final argument. Defendant was convicted. This appeal follows.

■ Defendant argues the court erred by refusing to give jury instructions based on the defense of necessity. The elements of that defense are (1) the person claiming the defense was without blame in occasioning or developing the situation; and (2) the person reasonably believed that his conduct was necessary to avoid a greater public or private injury than that which might have reasonably resulted from his conduct. (Ill. Rev. Stat. 1985, ch. 38, par. 7—13.) This defense is classified as an affirmative defense. (*People v. Taylor* (1975), 31 Ill. App. 3d 20, 25, 332 N.E.2d 735, 738; Ill. Rev. Stat. 1985, ch. 38, par. 7—14.) Case law indicates that unless the State's evidence raises the defense for him, the defendant must present " 'some evidence' " in support thereof. (*People v. Perez* (1981), 97 Ill. App. 3d 278, 280, 422 N.E.2d 945, 947.) However, the " 'some evidence' " to be deemed adequate to raise the defense must be evidence sufficient to raise a reasonable doubt as to defendant's guilt. See *People v. White* (1979), 78 Ill. App. 3d 979, 981, 397 N.E.2d 1246, 1247.

The State responds that since the offense in this case, unlawful possession of weapons by a felon in prison, is a strict liability offense, the defense of necessity is unavailable. It notes our supreme court has stated:

"But section 24—1.1(b) eliminates any unlawful-intent requirement with respect to a felon who is confined in prison at the time of the offense, and the apparent purpose of the statute is to prohibit even the innocent possession of items that are likely to be hazardous in the penal setting." (*People v. Ryan* (1987), 117 Ill. 2d 28, 32-33, 509 N.E.2d 1001, 1002, *cert. denied* (1987), ___ U.S. ___, 98 L. Ed. 2d 138, 108 S. Ct. 186.)

Therefore, it argues since the purpose of the statute is to prohibit even innocent possession of weapons, then clearly the legislature, by enacting the statute, intended to preclude the use of the affirmative defense of necessity.

The State believes this argument is further buttressed by the recently enacted amended section 24—1.1, which reads in part:

"(b) It is unlawful for any person confined in a penal institution, which is a facility of the Illinois Department of Corrections, to possess any weapon prohibited under Section 24—1 of this Code or any firearm or firearm ammunition, regardless of the intent with which he possesses it.

(c) It shall be an affirmative defense to a violation of subsection (b) hereof, that such possession was specifically authorized by rule, regulation, or directive of the Illinois Department of Corrections or order issued pursuant thereto." (Pub. Act

85—736, eff. Sept. 22, 1987 (amending Ill. Rev. Stat. 1985, ch. 38, par. 24—1.1).)

The State asserts this clarifies the intention of the previous section to limit possible defenses by restricting the only possible affirmative defenses to those contained in subsection (c).

Finally, the State asserts that at least one other court has held in accordance with its position. (*People v. Henigan* (1986), 146 Ill. App. 3d 168, 497 N.E.2d 134.) However, a close reading of that case indicates otherwise. That court stated:

"Neither self-defense nor necessity, however, may be raised against the charge of knowing possession of a firearm by a felon, *where as here*, defendant told police he was carrying the gun that night before the fight occurred." (Emphasis added.) (*Henigan*, 146 Ill. App. 3d at 172, 497 N.E.2d at 136.)

It is clear the court was not making a blanket statement concerning the availability of the defense but was only finding, due to the facts in that case, that the defense was unavailable.

▪▪ ▪ Similarly, we find the State's other arguments unpersuasive. We do not read the recently enacted amended statute as indicating an intent by the legislature to foreclose all possible defenses except those contained in subsection (c). Rather, it appears this amendment was included to preclude possible constitutional arguments concerning the innocent possession of kitchen utensils or shop tools. (See *People v. Ryan* (1987), 117 Ill. 2d 28, 34-35, 509 N.E.2d 1001, 1003.) Also, the fact the offense is a strict liability offense is of little consequence. We note the committee comments suggest the use of the defense to another strict liability offense, speeding. (Ill. Ann. Stat., ch. 38, par. 7—13, Committee Comments—1961, at 450 (Smith-Hurd 1972).) Further, while we believe for policy reasons the defense should be limited in these type of cases, we can envision circumstances when its use would be appropriate.

▪▪ Having found the defense available to this type of offense, we need now explain that the court did not err in refusing to instruct the jury on it. The policy behind the criminal offense with which we are faced in this case is clear. As the supreme court noted, it is to "prohibit even the innocent possession of items that are likely to be hazardous in a penal setting." (*Ryan*, 117 Ill. 2d at 33, 509 N.E.2d at 1002.) It is obvious that the possession of dangerous weapons by inmates will have an adverse affect on the orderly administration of the prison and will severely threaten the physical well-being of the inmates and the prison staff. The problem that the penal authorities are facing in this regard is obviously staggering in view of the fact that at

one time 118 weapons were found from a group of 400 to 450 men. Pontiac is filled with violent men who are there for performing violent acts. To allow them to possess weapons in any but the most desperate situations would defy common sense and exacerbate an already difficult and precarious security situation. "In light of what has been termed 'the central objective of prison administration, safeguarding institutional security' [citation], prison authorities have an obvious interest in preventing prisoners' access to weapons." *Ryan*, 117 Ill. 2d at 35-36, 509 N.E.2d at 1004.

■ The defense of necessity may be described as involving a choice between two admitted evils. (*People v. Whitson* (1984), 127 Ill. App. 3d 999, 1004, 470 N.E.2d 1054, 1058.) The evils to be faced which would authorize the use of the defense must be grave and serious. (*People v. White* (1979), 78 Ill. App. 3d 979, 982, 397 N.E.2d 1246, 1248.) In the present case, as noted, there is a strong policy against inmates possessing weapons. Accordingly, the situation an inmate must face to justify possession of a weapon must be immediate and urgent. In the present case, defendant testified he received the threatening note three to four weeks before the knife was found. This clearly falls far short of the type of situation which would justify possession of a weapon.

Also, in *White*, the court stated:

> "Necessity requires that there be an alternative to an evil course and that alternative be evil as well. Where there is yet another alternative—besides the two evil choices—and such alternative, if carried out, will cause less harm, then a person is not justified in breaking the law." *White*, 78 Ill. App. 3d at 981, 397 N.E.2d at 1247.

■ In *People v. Perez* (1981), 97 Ill. App. 3d 278, 281, 422 N.E.2d 945, 948, the court, in a case involving unlawful possession of weapons by a felon, held that the defense of necessity justifies only such otherwise illegal conduct which constitutes the *sole* reasonable alternative available. In the present case, there were other legal alternatives available to defendant. He could have reported the threat to the authorities, or asked to be placed in protective custody, or transferred to another institution. The reason he did not do so was strictly personal preference. He believed to do so was unmanly, and he would rather carry a weapon to defend himself as a "man" should. This is exactly the type of conduct and attitude which must be discouraged if some control is to be maintained over the prison system.

■ Accordingly, since the evidence presented establishes that defendant was not faced with an emergency situation and that

defendant did not avail himself of other legal alternatives, we find the court properly refused to instruct the jury on the necessity defense.

Defendant next contends the court erred by allowing testimony concerning the second knife found in the cell. Under cross-examination, defendant admitted the knife belonged to him, stating he kept it as a spare in case he lost the first one during a shakedown. Defendant maintains this is an impermissible introduction of evidence of other crimes and that it unfairly prejudiced him.

■■ Generally, evidence of other crimes is inadmissible if its sole purpose is to establish defendant's propensity to commit crimes. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238, 242.) Evidence of the commission of other crimes is admissible, however, when such evidence is relevant to prove *modus operandi*, intent, identity, motive, or absence of mistake. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 824, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.) In fact, evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit a crime. *People v. Baptist* (1979), 76 Ill. 2d 19, 27, 389 N.E.2d 1200, 1204.

■■ The court allowed admission of the questioned evidence as going to intent. Since intent is not an element of the charged offense (*People v. Ryan* (1987), 117 Ill. 2d 28, 509 N.E.2d 1001), it is assumed the purpose of its admission was to attack defendant's assertion that he possessed the knife for purposes of self-defense. However, we need not determine the propriety of the admission of this evidence since we find that even if its admission was error, it was harmless. To sustain a conviction in this case, the State must show that the defendant was a convicted felon in prison and he possessed a dangerous weapon. The State did this without any reference to the other knife. In fact, defendant admitted all these elements. Accordingly, it is clear that any possible error in admission of this evidence had no prejudicial impact on defendant and does not require reversal. See *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E.2d 347, 350, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290.

■■ Defendant next asserts the court erred by precluding him from testifying to a brutal beating he received some time after the knife was found in his possession. He maintains this evidence was necessary to buttress his assertion that he was threatened and possessed the knife only for purposes of protection. However, since we have decided that the defense of necessity is unavailable to defendant since he did not report the original threat to the authorities or avail himself of protective custody, the admission of this evidence, even if it

had been proper, would have no effect on the outcome, and is, at most, harmless error.

Defendant next contends he was denied effective assistance of counsel since his counsel refused to conduct a closing argument. At the close of the evidence, the court ruled that it would not allow defense counsel to argue defendant had a legal defense of necessity. However, he would allow defense counsel to argue defendant's fear as an excuse for his behavior. Counsel believed it would be unethical to do so and refused to make any argument.

■■■ ■■ The United States Supreme Court enunciated the standard to evaluate the ineffectiveness of assistance of counsel in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which was adopted by Illinois in *People v. Albanese* (1984), 104 Ill. 2d 504, 526, 473 N.E.2d 1246, 1255, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061. The standard is that the constitutionally guaranteed assistance of counsel has not been provided if the defendant can prove that counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. (*Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) A defendant must establish that there is a reasonable probability that but for counsel's unprofessional errors, the result would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) The court observed that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

■■■ Counsel's conduct in refusing to make final argument, whether based on frustration or misapprehension, is very possibly subject to criticism. In court trials, emotions are natural but should not be allowed to interfere with good judgment. We need not determine if the conduct falls below an objective level of reasonableness since we find defendant suffered no prejudice. As noted earlier, the offense is a strict liability offense, and defendant admitted all the elements. Therefore, it is clear the result would have not been different had closing argument been given.

Finally, defendant argues the court improperly considered an aggravating factor in imposing the sentence, and that the sentence was excessive. Defendant was convicted of a Class 1 felony, which has a possible penalty of 4 to 15 years' imprisonment (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1). Since defendant was imprisoned at the time

the offense was committed, the sentence was required to be served consecutively to the current one. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(f).) After reviewing the presentence report, the court found defendant's criminal history to be an aggravating factor and sentenced defendant to six years' imprisonment to be served consecutively to the sentence he was currently serving.

 Defendant first argues this sentence is the result of an improper double enhancement for his prior felony record. He asserts the offense was raised from a misdemeanor to a Class 3 felony due to a prior felony conviction. The penalty was increased from a Class 3 to a Class 1 felony due to his imprisonment on the felony conviction. He argues that to allow the court to further consider his criminal record as an aggravating factor for sentencing purposes is an improper double enhancement.

Defendant relies on *People v. Hobbs* (1981), 86 Ill. 2d 242, 427 N.E.2d 558. In that case, a prior theft conviction was used to enhance a theft offense from a misdemeanor to a felony. At sentencing, that same prior theft conviction was used to qualify defendant for an extended term. The supreme court, after analyzing the statutory sections, decided that this procedure was an impermissible double enhancement. See also *People v. Gresham* (1982), 104 Ill. App. 3d 81, 432 N.E.2d 654.

However, defendant's reliance on these cases is misplaced since defendant did not receive an extended-term sentence. We can find no authority, nor has any been cited to us, for the proposition that it is improper for the court to consider defendant's prior criminal history in a case such as this. We also note defendant has three prior felony convictions. Thus, even if one was to be disregarded as the underlying felony in this case, there are still two others which would be properly considered. Accordingly, the court's consideration of defendant's criminal history as an aggravating factor is proper.

 Lastly, defendant asserts the sentence is excessive. He cites, as a mitigating factor, that no one was injured; he did not use the knife; and he has not created problems in prison. The court relied on defendant's criminal history and the need to deter this type of conduct as an aggravating factor.

Since the trial court is in a better position to determine the punishment to be imposed, that imposition is in the sound discretion of the trial court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.) Absent an abuse of such discretion, the sentence shall not be disturbed. (*People v. Cox* (1980), 82 Ill. 2d 268, 281, 412 N.E.2d 541, 548.) In this case, we find no such abuse. We believe

defendant's sentence is justified by his history of armed criminal activity and the obvious need to deter defendant and other inmates like him from desiring to act as "men" and possessing and using dangerous weapons while incarcerated.

Affirmed.

GREEN, P.J., and KNECHT, J., concur.