THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GUY JOHNS, Defendant-Appellant.

Fourth District No. 4—91—0013

Opinion filed October 24, 1991.

Daniel D. Yuhas and Gloria Ann Morris, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald D. Bernardi, State's Attorney, of Pontiac (Kenneth R. Boyle, Robert J. Biderman, and Elliott Turpin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

After a jury trial, defendant Guy Johns was convicted of unlawful possession of a weapon by a person in the custody of the Department of Corrections in violation of section 24—1.1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1). He was sentenced as a Class X offender to a term of six years' imprisonment, pursuant to section 5—5—3(c)(8) of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(c)(8)); this term was to be served consecutively to a sentence for an unrelated felony offense. Defendant appeals, alleging (1) the court erred in denying his request for a jury instruction on the defense of necessity; and (2) the State failed to prove beyond a reasonable doubt the statutory prerequisites for sentencing as a Class X offender, and double jeopardy bars his resentencing as a Class X offender. We affirm.

Defendant was charged by indictment with the Class 1 felony of unlawful possession of a weapon by a felon, in that on October 28, 1989, he possessed a dagger-like weapon (referred to as a "shank") while an inmate of Pontiac Correctional Center (Pontiac).

On May 15, 1990, the date the trial was to commence, defendant announced his intention to proceed *pro se* and requested that his second court-appointed attorney be discharged. Defendant had previously discharged his first appointed attorney, alleging that attorney was not representing his interests. After admonishing defendant that his decision was ill-considered, the court found the defendant capable of making the decision to fire his lawyer and capable of representing himself. He then allowed defendant's counsel to be discharged and the trial proceeded.

Several correctional officers from Pontiac testified at trial. Officers Russell Eckert and Stanley Patton stated that on the morning of October 28, 1989, they conducted a routine shakedown of cell 806 in the protective custody unit, which housed the defendant and his cell-

mate Brent, searching for contraband. A pat-down search of Brent uncovered a shank in his pocket. At that point defendant handed Officer Eckert another shank, approximately six inches in length, and gave Officer Patton a letter to the warden. Both inmates were then taken to segregation.

Billy Hyson, an inmate in the protective custody unit at Pontiac, testified for the defendant. Over objection by the State as to relevancy, Hyson testified that on the morning of October 26, two days before the shank was recovered from defendant, gang members from the Vice Lords attacked him while on the way to breakfast. Hyson testified that defendant and an inmate named Postlewaite were friends of his and they got into the fight as well. Hyson stated that an inmate named King, a member of the Vice Lords, pulled a knife, slashed defendant's ear, and cut another inmate named Tillman on the hand. The guards took only Hyson and Tillman to segregation.

William Postlewaite next testified on behalf of the defendant. He stated that he was an inmate in the protective custody unit at Pontiac and that he was present during the attack on Hyson on October 26. Again over objection by the State, Postlewaite stated that Hyson was attacked by gang members and, in the course of the altercation, Tillman and defendant were injured. Postlewaite stated that he and King were placed under investigation.

Defendant then testified on his own behalf. He stated that three days before the shank was discovered in his possession he had heard that a gang member called King Fish had beaten his friend Billy Hyson. Defendant said he confronted King Fish, who told him that if he got involved "there was some for [defendant] too." Although defendant considered this a threat, he ignored it. The following morning, October 26, while the inmates were on the way to breakfast, defendant again confronted King Fish. According to defendant, the gang members then began swinging and pulling knives. Defendant stated that he was cut on the ear and Tillman was cut on the hand. He stated that he did not go to a doctor for treatment of his injury nor report who had wielded the knives because he did not want to appear a "stool pigeon" to the onlookers. Defendant then put on a cap to conceal the injury to his ear from the guards. "I put the skull cap over my ear and I didn't want to have to go to segregation and then have to lie about what happened ***." Later, one of defendant's friends told him he was going to be "hit" when he went through the tunnel. Defendant walked with his friends and nothing happened. Defendant went to his cell and made the shank from his bedsprings. Defendant stated that he talked to Captain McBirney about the threat but Mc-

Birney only talked to the gang members as though they were friends. Defendant said he made no further effort to get anyone else to do anything, but planned to "let them approach me and I will cut his [*sic*] throat out. I am just trying to defend my life for what already happened to me so my mind was made up about that."

Defendant testified that even though he was in the protective custody unit at Pontiac he did not feel protected. He stated that he did feel safe in segregation, so on the morning of October 28, he wrote a letter to the warden explaining why he made the shank and what had happened while incarcerated in protective custody. He gave this letter to the guard when he handed over the shank during the shakedown of his cell.

At the conclusion of the evidence, the trial court refused defendant's tendered jury instruction on the affirmative defense of necessity, finding no evidence that "on October 28, 1989 something was occurring which put [defendant] in danger and jeopardy of serious bodily harm and that he had no choice but to grab a weapon." Consequently, the court found there was insufficient evidence in support of a necessity defense and rejected the jury instruction. Defendant was convicted.

At the subsequent sentencing hearing, the State submitted a presentence report and certified copies of defendant's prior convictions for robbery on November 30, 1982, and for murder on July 28, 1987. None of the documents included the dates of commission of the prior offenses.

The court found defendant was subject to mandatory Class X sentencing pursuant to section 5—5—3(c)(8) of the Code, and sentenced him to six years' imprisonment to be served consecutively to the sentence he was then serving.

Defendant first argues the court erred in refusing his jury instruction on the defense of necessity because he presented "some evidence" supporting his theory of defense. *People v. Tackett* (1988), 169 Ill. App. 3d 397, 402, 523 N.E.2d 647, 650.

■ In *People v. Govan* (1988), 169 Ill. App. 3d 329, 337, 523 N.E.2d 581, 586, this court determined that necessity might be appropriate under certain circumstances as a defense to a charge of unlawful possession of a weapon by a person in the custody of the Department of Corrections, but for policy reasons its availability was limited. In *People v. Ryan* (1987), 117 Ill. 2d 28, 33, 509 N.E.2d 1001, 1002, the supreme court noted that the policy supporting the statutory offense "is to prohibit even the innocent possession of items that are likely to be hazardous in the penal setting." The evils the inmate

faces, to justify possession of a weapon and entitlement to a necessity defense, must be immediate and urgent. *Govan*, 169 Ill. App. 3d at 338, 523 N.E.2d at 586.

■ In *Tackett*, this court was again presented with a claim of necessity to a charge of unlawful use of a weapon by a felon incarcerated at Pontiac. We determined that assessment of the availability of a necessity defense involved consideration of several factors: (1) whether the prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future; (2) whether there is time for complaint to the authorities or there exists a history of futile complaints which make any result from such complaint illusory; and (3) whether there is time or opportunity to resort to the courts. *Tackett*, 169 Ill. App. 3d at 402, 523 N.E.2d at 650; *People v. Unger* (1977), 66 Ill. 2d 333, 342, 362 N.E.2d 319, 323.

■ In applying the above factors to this case, it is clear defendant was not faced with an emergency situation when he possessed the shank, and he failed to show that he chose the least harmful alternative in arming himself with the shank. The threat by King Fish three days before the shank was found was nonspecific and was more of a warning to defendant that he was not to "get involved" in the dispute with Hyson. The warning of a "hit" that never materialized occurred two days before the shank was found. While defendant reported this threat to Captain McBirney, he made no further effort to contact another correctional officer, but instead decided to procure the shank.

Defendant claims that his purpose in making the shank and writing the letter to the warden was to get into segregation, where he would be safe. However, defendant's testimony belies his claimed defensive posture and sounds rather as planned retaliation. He testified that he planned to wait until a gang member approached him when he would "cut his throat out." Further, defendant contradicts his claimed purpose of making the shank to secure placement in segregation. He apparently had the opportunity to be taken to segregation following the October 26 altercation simply by revealing his slashed ear and requesting medical attention, but instead he concealed his injury under a cap because he did not want to appear a "stool pigeon" or be sent to segregation, where for some undisclosed reason he would have to lie about what happened. It is clear defendant submitted no evidence to support a necessity defense, and the trial court properly refused to submit defendant's jury instruction. Accordingly, defendant's conviction is affirmed.

Defendant next argues that at his sentencing hearing the State failed to prove beyond a reasonable doubt the statutory prerequisites

for Class X sentencing by omitting proof of the dates of commission of his prior offenses. Defendant further argues that, on remand, principles of double jeopardy attach so as to bar resentencing him as a Class X offender, citing *People v. Hamilton* (1990), 198 Ill. App. 3d 108, 113, 555 N.E.2d 785, 787.

 Defendant argues, and the State concedes, that his sentence as a Class X offender must be reversed and the cause remanded for resentencing because the State failed to show the dates defendant committed robbery and murder upon which his prior convictions were based. The dates on which the prior offenses were committed must be shown as a statutory prerequisite to sentencing as a Class X offender pursuant to section 5—5—3(c)(8) of the Code, and requires us to reverse the sentence and remand for resentencing. *People v. Shelton* (1991), 208 Ill. App. 3d 1094, 1098, 567 N.E.2d 680, 681; *People v. Washington* (1990), 195 Ill. App. 3d 520, 529, 552 N.E.2d 1067, 1072-73.

 We do not agree, however, that on remand the State's burden of proof is beyond a reasonable doubt, or that double jeopardy bars resentencing defendant as a Class X offender. This court in *Shelton* expressly rejected the reasoning applied in *Hamilton* as to the State's burden of proof and as to the application of double jeopardy principles at resentencing. We adhere to the precedent of *Shelton* and reject defendant's request that we overrule that decision. We noted that the dates of commission of offenses for which defendant was previously convicted were not elements of the underlying substantive offense but only the prerequisites for sentence enhancement. "[T]he factual basis for a defendant's eligibility to be sentenced as a Class X offender under section 5—5—3(c)(8) of the *** Code may be presented in any manner that the sentencing court, in its discretion, finds to be reliable and trustworthy." *Shelton*, 208 Ill. App. 3d at 1105, 567 N.E.2d at 686.

In *Bullington v. Missouri* (1981), 451 U.S. 430, 438, 68 L. Ed. 2d 270, 279, 101 S. Ct. 1852, 1858, the United States Supreme Court determined that double jeopardy interests may be implicated in a sentencing proceeding if the proceeding "was itself a trial on the issue of punishment." In applying the principles of *Bullington*, we determined in *Shelton* that defendant's prior sentencing proceeding under the Class X offender statute "lacked the hallmarks of a trial on the [issue of] punishment" for the substantive offense of burglary. *Shelton*, 208 Ill. App. 3d at 1104, 567 N.E.2d at 686.

Similarly, in the case at bar, the elements of defendant's underlying substantive offense, possession of a weapon by an incarcerated

felon, were proved under the reasonable doubt standard, and the dates of commission of previous offenses are nonadversarial facts immaterial to that charge. The sentencing hearing lacked the substance of a trial and the question of guilt was not at issue. Defendant called one of the same witnesses who testified at trial to give evidence in mitigation of sentence. He also testified in his own behalf—essentially restating the same facts he testified to at trial. The State submitted the presentence report and certified copies of defendant's convictions. No evidence refuting defendant's eligibility for Class X sentencing was offered.

As support for his contention that double jeopardy principles attach to a sentencing hearing, defendant cites *Lockhart v. Nelson* (1988), 488 U.S. 33, 102 L. Ed. 2d 265, 109 S. Ct. 285. There, Johnny Lee Nelson had been convicted in an Arkansas court of burglary and misdemeanor theft. That court then sentenced him to an enhanced term of imprisonment as an habitual criminal. The statute pursuant to which the sentence was imposed required proof of the four enhancing convictions in one of three formal ways and required that proof to be made beyond a reasonable doubt. *Lockhart*, 488 U.S. at 35, 102 L. Ed. 2d at 270, 109 S. Ct. at 287-88, citing Ark. Stat. Ann. §§41—1005, 41—1003 (1977) (current version at Ark. Stat. Ann. §§5—4—502, 5—4—504 (1987)).

The sentencing proceeding was required to be separate from the trial on the question of guilt. Subsequently, in a Federal *habeas corpus* proceeding the question was whether the fact that Nelson had been pardoned for one of the offenses, the conviction for which had been used to enhance sentence, (1) required the sentence be set aside, and (2) barred resentencing as an habitual criminal on double jeopardy grounds.

The United States Supreme Court eventually granted *certiorari* in the *habeas corpus* proceeding to determine whether resentencing as an habitual criminal would be barred as constituting double jeopardy. The State did not raise the issue that, unlike *Bullington*, death sentencing procedures were not involved.

The United States Supreme Court concluded that the error in the State trial court was the improper admission of evidence and not the lack of evidence. Accordingly, retrial of Nelson on the issue of an enhanced sentence was not barred.

Thus, *Lockhart* did not directly reach the issue of whether the requirements of *Bullington* extend to noncapital sentencing cases. However, assuming *arguendo*, that they do, clearly the procedures required in the Arkansas statute involved in *Lockhart* involved much

more of a trial on the issue of eligibility for an enhanced sentence than do the procedures here. The decision in *Lockhart* makes no inroads on the rationale of *Shelton*.

Therefore, we adhere to our position in *Shelton* and remand for a determination of the dates of commission of defendant's prior offenses to show defendant's eligibility to be sentenced as a Class X offender under section 5—5—3(c)(8) of the Code.

Affirmed in part; reversed in part and remanded.

LUND, P.J., and KNECHT, J., concur.