THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL WYDRA, Defendant-Appellant.

First District (5th Division)   No. 1—92—2085

Opinion filed June 30, 1994.

598

Neil H. Cohen, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Laura L. Morrison, and William M. Traynor, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

## NATURE OF THE CASE

After a jury trial in the circuit court of Cook County, defendant, Michael Wydra, was found guilty of aggravated battery and four traffic offenses (speeding, improper passing at an intersection, driving in the wrong direction, and fleeing and eluding a police officer). The jury found defendant not guilty of criminal damage to property and resisting arrest. The trial court sentenced defendant to 24 months' probation for the aggravated battery conviction. Regarding the traffic violations, the trial court entered judgment without further fine or penalty on the speeding and driving in the wrong direction convictions. The trial court did not enter judgment, but entered an order of supervision satisfied as to the improper passing and fleeing and eluding violations. Defendant appeals his convictions for aggravated battery, speeding, and driving in the wrong direction.

## FACTS

This case arose from an encounter on November 17, 1989, between defendant and two uniformed Morton Grove police officers, Matthew Pankow and Edward Mahnke. According to the testimony of both officers, they were sitting in their police cars at a gas station at Lincoln Avenue and Austin Boulevard at 1:40 a.m. when Officer Mahnke called Officer Pankow's attention to defendant's car, which was traveling west on Lincoln toward Austin at a high speed. Officer Pankow testified that at this point he activated his radar unit and recorded defendant's speed as 50 miles per hour. Officer Mahnke testified that his attention was on defendant's car at this moment, so he did not see Officer Pankow activate his radar. Officer Mahnke estimated that defendant was traveling at 15 to 20 miles per hour over the posted limit of 30 miles per hour.

Both officers testified that as defendant's car approached the intersection, it went into an eastbound lane, going around a car which was stopped in the left-hand westbound lane at the intersection. Officer Pankow activated the siren and the emergency lights atop his marked squad car, then pulled out of the gas station in pursuit of de-

fendant, Officer Mahnke following close behind in his unmarked police car with the emergency lights activated. According to the officers, defendant's car continued west in the eastbound lane of Lincoln Avenue for two blocks, then turned left for one block, then east on Elm Street, which is a dead end. After turning on Elm Street, defendant stopped his car in the middle of the street. Officer Pankow, who had activated his car's spotlight when defendant turned off Lincoln, brought his squad car to a stop behind defendant's car. As he did so, defendant got out and ran along the side of the home at 6045 Elm, which the officers later learned was where defendant lived. Officer Mahnke arrived as defendant ran from his car.

Officer Pankow testified that he left his vehicle and ran to look into an industrial park which was behind the backyard, at which time he heard a noise near the house. He turned to see defendant trying to open a door at the rear of the house. Although it was dark, there was an outside light near the door, and there were lights in the industrial park.

Officer Pankow further testified that he announced himself as "Police" and shined his flashlight across the yard at defendant, who was 30 or 40 feet away. Defendant then charged at him, yelling, "Shoot me, you f------ a------. Kill me." Defendant attempted to get the officer's service revolver from its holster. As Officer Pankow tried to cover the holster with his hands, defendant hit him and scratched at the officer's hands. Officer Pankow pushed the emergency button on his radio which sent a signal that the officer needed assistance. The two men wrestled to the ground. Pankow stayed on the ground, leaning to the side to keep defendant from getting his service weapon.

Officer Pankow stated that at this point he saw defendant's parents standing in the yard. Officer Mahnke arrived and distracted defendant. Officer Pankow was then able to get up. Defendant again charged at Pankow, and Officer Mahnke pulled defendant to the ground. The two officers then handcuffed defendant. Officer Pankow stated that during the entire incident he was wearing his navy blue police uniform, his polished metal star and name tag, and his navy blue police jacket, which had a yellow and light blue insignia patch and which defendant tore during the scuffle.

Defendant and Officer Pankow were transported by ambulance to a hospital where Officer Pankow was treated for scratches on his hands and chin. Pankow also had a bruised shoulder and arm. Defendant was transferred to a different hospital where he remained for psychiatric care for the next eight days.

On cross-examination, Officer Pankow admitted that his report

indicated that defendant was traveling at 60 miles per hour and it did not mention use of radar. Neither did his report note that he was injured by defendant. He had suggested that defendant be taken to the hospital for defendant's own safety because he appeared upset, irritated and irrational.

Officer Pankow also testified on cross-examination that he completed and signed the complaints (the tickets) for the four traffic offenses. He admitted, however, that, although the tickets included a certification that they were subscribed and sworn to in the presence of a deputy clerk whose signature also appears on them, Officer Pankow did not, in fact, swear to the information in those complaints. He stated that it was police department policy not to do so.

Officer Mahnke testified that while pursuing defendant, he shined his spotlight toward the driver's side of defendant's car. After reaching the house, Officer Mahnke headed for the industrial park, but returned when he heard the radio message that Officer Pankow needed assistance.

As he arrived in defendant's backyard, he heard yelling, so he shined his flashlight. He saw defendant standing over Officer Pankow who was on the ground, his hands covering his gun, his shoes off, and his feet in a defensive position. Defendant was yelling, "Shoot me, kill me. I want to die." Officer Mahnke grabbed defendant and wrestled him to the ground. As Officer Pankow told him defendant had tried to get his gun, Officer Mahnke felt defendant reach for his gun. The two officers managed to overcome defendant and handcuff him.

On cross-examination, Officer Mahnke stated that, while he did not see defendant hit Officer Pankow with his fists and Officer Pankow did not complain to him of any injuries, he did see defendant hit Pankow with an open hand and grab his shoulder. Officer Mahnke observed that defendant was angry and behaving violently, attempting to injure himself and the officers. He thought defendant should be taken to the hospital for his own protection. Officer Mahnke also admitted that it was very dark in the backyard and speculated that it might have been difficult for a person in navy blue clothing at the rear of the yard to be distinguished by someone standing at the doorway.

Morton Grove police officer David Jennetten testified for the defense. He lived nearby and was a social acquaintance of defendant. He had spoken with defendant earlier that evening at a bowling alley. Later, he went to defendant's backyard after hearing the police radio call. He testified that the overhead lights of Officer Pankow's police car were on when he arrived, as was the small light by the

back door. There were no lights in the backyard, but the industrial park behind it was lit and he had no trouble seeing anyone in the yard.

As he went into the yard, he saw the two officers handcuffing defendant as defendant's father stood nearby. Defendant asked Jennetten for his gun so that he could kill himself. Jennetten noticed there were scratch marks on Officer Pankow's hands. Later, he saw Officer Pankow treated at the hospital.

Officer Jennetten also testified that defendant has a reputation as a peaceful person. On cross-examination, he was asked, "Did you know that some time just before then that Mr. Wydra had been arrested for a battery?" Defense counsel objected. After a sidebar discussion in which the State made an offer of proof, the trial court sustained the objection and instructed the jury to disregard the question.

Officer Jennetten also stated on cross-examination that defendant had a couple of drinks in his presence at the bowling alley and was still there an hour and a half later when Jennetten left.

Defendant's mother, Rita Wydra, also testified for the defense. On the night of November 17, 1989, she was awakened by the sound of her back doorbell. She went to the enclosed porch and looked out. She thought she saw her son and the silhouette of another person in the backyard. She heard her son say, "Go ahead and shoot me. I want to die." She went to get her husband, then put on a coat and shoes and went out to the backyard. There she saw two officers near the door. Defendant was lying on the ground in the middle of the yard. She testified that she went to him, turned him over onto his back and brushed dirt and grass from his face, then tried to calm him down, as he was "grumbling and wiggling."

Ms. Wydra also testified that, prior to this incident, defendant had been depressed over the breakup of a relationship with a girl friend, Lori Johnson. Ms. Wydra was allowed to testify over the State's objection that defendant was afraid of Lori's father, who had threatened to kill him. She was also allowed to testify that, shortly after this occurrence and defendant's return from the hospital, defendant woke her late one night to say goodbye, then left the house. She and defendant's father went after him, finding him straddling a railing above the expressway. He ran from them to the next overpass, where police apprehended him.

On cross-examination, the State asked Ms. Wydra if defendant had "bothered" his former girl friend at her place of employment. She answered "I don't think so." Defendant's objection to this question was sustained. The State also asked Ms. Wydra when defen-

dant first told her that Lori's father, Mr. Johnson, had threatened to kill him. She answered that it was on the night Mr. Johnson was arrested for attacking defendant's friends. The State then asked, "And wasn't that after Mr. Johnson's house had been set on fire?" Defense counsel objected. After a discussion in chambers and *voir dire* of Ms. Wydra, the court sustained the objection, but ruled that the State could ask Ms. Wydra whether defendant told her why Mr. Johnson threatened to kill him. However, when cross-examination resumed, the State did not pursue that line of questioning any further.

Defendant's father, John Wydra, testified that on the night of November 17, 1989, he was awakened by the sounds of the doorbell, a knocking at the back door, and his wife calling to him. He put on his robe, slippers, and glasses and went onto the enclosed porch and looked into the yard. There he saw two silhouettes, but could not distinguish who they were because there was very little light from the industrial park behind the yard, and no light shed on the yard by the street light in front of the house. He went outside, walking about 30 to 35 feet into the yard at which point he recognized one of the men as his son. He heard no conversation or altercation of any kind, so he went back into the house to dress. When he returned, defendant was on the ground in the yard, handcuffed, with a police officer holding down his legs. There were a number of people standing nearby, two of whom he noticed wore Morton Grove police department uniforms.

John Wydra testified that later that night he told a doctor that defendant had been depressed before the incident, and he and his wife signed papers afterwards to admit defendant to the hospital.

Dr. Song Ling Chang treated defendant at the emergency room of Lutheran General Hospital on the night of November 17, 1989. He testified that defendant was upset because of a girl friend and threatened to commit suicide. Defendant had difficulty understanding what was happening. Dr. Chang diagnosed defendant's condition as major depression disorder and concluded that defendant was dangerous to himself and should be hospitalized. On cross-examination, Dr. Chang stated that defendant had been uncooperative and belligerent and his blood-alcohol level was above the point where impairment results.

Defendant testified in his own behalf that for some time before the incident on November 17, 1989, he had been suffering from stomach problems, headaches, and loss of sleep because of the breakup with Lori Johnson. That evening he visited at the bowling alley, then went to a bar in Des Plaines where he had two drinks. He left the

bar at 1:20 a.m. As he approached the intersection of Austin and Lincoln from the east, he veered slightly left to go around a car which was turning right at the intersection. He testified that he did not go into the oncoming traffic lanes. He saw no cars or flashing lights behind him and heard no sirens. He turned off Lincoln onto Morton, then onto Elm. Because there were other family vehicles parked in his driveway, he parked the car in the street, which is a dead end. He went to the back door off the porch at his home, but could not find his keys. After spending 1 to $1^1/2$ minutes looking for his keys in the carport area alongside the house, he returned to the back door and rang the bell.

Defendant stated that he saw something moving in the backyard. There was a small yellow "bug light" above the door. Although there was some illumination of the yard from the lights in the industrial park, there were several large trees in the yard which blocked out some of the light. Defendant, seeing a figure coming towards him, became frightened, so he rang the bell three or four times and banged on the door. He then ran towards "them" (apparently referring to the approaching figure) and "they" grabbed him and threw him face down on the ground. Defendant did not hear anyone announce that he was a policeman. He did not recall trying to get anyone's gun so he could shoot himself. The next thing he remembered was being in the ambulance. On cross-examination, defendant stated that the figure he saw in the backyard had been only one person whom he presumed was a robber. He admitted that he yelled for the man to shoot him and said he wanted to die, but he testified that he did so only to scare the robber, believing that all robbers have guns. He admitted kicking the man after the man threw him down. He denied seeing a gun or trying to grab at a gun. Defendant did not remember seeing his father or Officer Jennetten in the yard or asking Jennetten for his gun.

Over objection, the State asked defendant on cross-examination if he told an acquaintance, Tom Adams, that he planned to show to his former girl friend's co-workers a photograph in which she was partially nude. At first defendant stated that he had no such photograph, but then he admitted he gave the picture to one of Lori's co-workers. The trial court admonished the jury that this testimony was to be considered only as indication of defendant's state of mind. At the prior request of defense counsel, the trial court did not tell the jury that defendant had been acquitted of obscenity charges stemming from that incident.

The State was also allowed, over objection, to ask defendant if he recalled screaming names at Lori's new boyfriend, biting him, and

striking him with a piece of wooden fence post on September 2, 1989. Defendant replied "I do not recall that, no." He stated that he was not angry because Lori was dating someone else. The court refused to allow the State to perfect the impeachment with extrinsic evidence that defendant struck Lori's boyfriend.

The State further elicited from defendant that upon being admitted to Alexian Brothers hospital, he told medical personnel that he wanted to commit suicide.

Officer Pankow testified in rebuttal that defendant's mother never approached defendant, turned him over, or removed grass from his mouth. He also stated that defendant's father was present when defendant asked Pankow to shoot him.

Dr. Anthony D'Agostino, a psychiatrist at Alexian Brothers Hospital, testified that he saw defendant while he was hospitalized. Defendant told him he had been grieving over the loss of a relationship and he was angry at his former girl friend and her father, whom he blamed for the breakup. Defendant also told Dr. D'Agostino that he had been chased by police and then fought with them. Defendant had no trouble recalling events of that night. Dr. D'Agostino diagnosed defendant's condition as adjustment disorder with mixed emotional features. He testified that this disorder does not interfere with a person's ability to form intent to do things. The doctor also made a secondary diagnosis of alcohol abuse. He did not think defendant was "committable," although defendant had told him he might commit suicide if things did not go well in court.

The jury found defendant not guilty of criminal damage to property and resisting arrest, but guilty of aggravated battery and the four traffic violations. The trial court sentenced defendant to two years' probation for the aggravated battery. The trial court entered judgment without further fine or penalty on the violations for speeding and driving in the wrong direction. It did not enter judgment on the violations for improper passing at an intersection and fleeing and eluding police. With respect to those two charges, the trial court entered an order of supervision completed.

OPINION

On appeal defendant contends that the evidence was insufficient to prove him guilty of the offenses of aggravated battery, speeding, and driving in the wrong direction, that certain testimony about prior acts of misconduct was so prejudicial that defendant was deprived of a fair trial, and that the court erroneously denied his request for a defense of property instruction. Defendant also contends that the traffic convictions must be reversed because the complaints

were not verified, the complaint for driving in the wrong direction failed to state the offense with sufficient specificity, and the trial court erroneously refused to allow defendant to use part of a learned treatise during his examination of Officer Pankow. Lastly, defendant contends that the guilty verdict for aggravated battery must be reversed because it is logically and legally inconsistent with the not guilty verdict for resisting arrest.

We affirm the traffic convictions and reverse the aggravated battery conviction, which we remand for a new trial, and we deal only with those other issues which, if resolved in defendant's favor, would require reversal without remand on all convictions or which would compel outright reversal on any of them.

We deal first with defendant's contention that the evidence presented in this case was insufficient to find him guilty beyond a reasonable doubt of aggravated battery, speeding, or driving in the wrong direction. In reviewing a challenge to the sufficiency of the evidence, the reviewing court must ascertain whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Furby* (1990), 138 Ill. 2d 434, 455, 563 N.E.2d 421; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.

●1 In order to find defendant guilty of aggravated battery in this case, the State was required to prove beyond a reasonable doubt that defendant committed a battery, *i.e.*, intentionally or knowingly and without legal justification caused bodily harm to Officer Pankow, knowing that Officer Pankow was a peace officer engaged in the execution of his official duties. (See Ill. Rev. Stat. 1989, ch. 38, pars. 12—3, 12—4(b)(6).) Defendant contends that the evidence was insufficient to establish bodily harm or knowledge that Officer Pankow was a peace officer.

Regarding the issue of bodily harm, we note that in *People v. Mays* (1982), 91 Ill. 2d 251, 437 N.E.2d 633, the Illinois Supreme Court wrote, "Although it may be difficult to pinpoint exactly what constitutes bodily harm for the purposes of the [battery] statute, some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent, is required." (*Mays*, 91 Ill. 2d at 256. See also *People v. Roberts* (1989), 182 Ill. App. 3d 313, 320, 537 N.E.2d 1080; *People v. Rotuno* (1987), 156 Ill. App. 3d 989, 993, 510 N.E.2d 463.) Although defendant admitted he shoved Officer Pankow during the altercation, he contends that this is not sufficient to establish bodily harm.

●2 We note, however, that there was substantial testimony in court, aside from the shoving which defendant admitted, which would sustain a finding of bodily harm to Officer Pankow. Officer Pankow testified that defendant clawed with his fingernails at Pankow's hands in an attempt to get the officer's service revolver from his holster. Officer Pankow's testimony was that he sustained scratches on his hands and chin for which he received treatment at the hospital following the incident. He also testified that he sustained bruises to his shoulder and arm. (See *People v. Jenkins* (1989), 190 Ill. App. 3d 115, 127, 545 N.E.2d 986 ("Bruises are considered proof that a battery occurred").) Officer Jennetten testified that he noticed scratches on Officer Pankow's hand and that he was there when Officer Pankow received treatment at the hospital.

It was not necessary that medical testimony be presented to document the injuries. (*People v. Green* (1977), 54 Ill. App. 3d 596, 599-600, 370 N.E.2d 42 ("The failure of the State to support [the officer's] testimony concerning those injuries with medical evidence is irrelevant. His testimony alone was sufficient to support a finding of bodily harm in a battery case"). See also *Rotuno*, 156 Ill. App. 3d at 992 ("there need not be direct evidence of injury to sustain a conviction of battery based upon bodily harm").) Moreover, that the police report does not mention injuries is not a direct contradiction of his testimony. It is an omission which constituted one factor for consideration in determining Officer Pankow's credibility. (See *Green*, 54 Ill. App. 3d at 599.) All of the evidence viewed in a light most favorable to the State was clearly sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant caused bodily harm to Officer Pankow.

Likewise, there was sufficient evidence from which the jury could have inferred that defendant knew the person in the backyard was a peace officer. While the attack took place near 2 a.m. in a dark yard, there was testimony that some light was cast by the bulb near the back door and the lights in the industrial park behind the yard. Officer Pankow stated that he shined his flashlight at defendant. Both Officers Mahnke and Pankow testified that during the scuffle, defendant reached for their holstered guns. From this testimony, the jury could conclude that there was enough light for defendant to have seen the indicia that Pankow was a police officer—his police uniform with yellow and light blue insignia, his polished metal star and name tag, and his holster—all of which would lead to the logical conclusion that he was a peace officer rather than a robber.

In addition, Officer Pankow testified that he announced he was the police. Also significant is the testimony of events preceding the

backyard encounter. Officers Mahnke and Pankow both testified that they pursued defendant for blocks with their overhead emergency lights on and that Officer Pankow used his siren. Officer Pankow drove a marked police car. They both testified that they followed defendant for a few blocks and that, as defendant stopped and ran around the front of his own car, Officer Pankow's marked squad car, with overhead emergency lights on, pulled up behind defendant's car. The weight to be given this testimony and the reasonable inferences to be derived from it are the responsibility of the jury. (*Furby*, 138 Ill. 2d at 455.) The cases of *People v. Bush* (1972), 4 Ill. App. 3d 669, 672-73, 281 N.E.2d 734, and *People v. Infelise* (1975), 32 Ill. App. 3d 224, 227, 336 N.E.2d 559, cited by defendant are inapposite. In each of those cases, the officer was dressed in casual street attire rather than in uniform. Also, there was no marked squad car in either case. Viewing the evidence in the present case in the light most favorable to the State, we cannot say that no rational finder of fact could conclude beyond a reasonable doubt that defendant knew he was attacking a police officer. See *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; *Collins*, 106 Ill. 2d at 261.

●3 Defendant also attacks the sufficiency of the evidence for the speeding and driving in the wrong direction offenses. Defendant points out that, while Officer Pankow testified he used radar to measure the speed of defendant's car as 50 miles per hour, his report does not indicate use of radar and Officer Mahnke testified that he did not notice whether Pankow used radar. However, as we have previously indicated with respect to Officer Pankow's failure to note his scratch marks on his report, the failure to note a material fact in the police report is but a single credibility factor to be weighed by the trier of fact. It does not render the evidence weightless. (See *Green*, 54 Ill. App. 3d at 599.) Moreover, in addition to the testimony as to the radar measurements, Officers Pankow and Mahnke both testified at trial that they recognized from their own perception that defendant's car was traveling at a high rate of speed, which they both estimated to be well in excess of the posted maximum of 30-mile-per-hour. Officer Mahnke testified that he was watching defendant's car rather than Officer Pankow at the time Pankow would have taken the radar reading. Defendant did not testify how fast he was going on Lincoln Avenue and thus did not contradict the evidence that he was speeding. Thus, a rational trier of fact could have concluded that defendant was guilty of speeding. See *People v. Hampton* (1981), 96 Ill. App. 3d 728, 730, 422 N.E.2d 11 (speeding conviction upheld where an officer had testified that the defendant's car was moving at a "high rate of speed" which was "probably 45 or so" in a 30-mile-per-hour zone).

Likewise, there was sufficient evidence to find defendant guilty of driving in the wrong direction. Both Officers Mahnke and Pankow testified that defendant pulled into the oncoming eastbound lane on Lincoln Avenue to pass on the left of a car stopped in the centermost westbound lane. Defendant, although claiming he did not go into the eastbound lane, did admit that he veered left around the car which was at the intersection. Both officers also testified that defendant's car remained in the eastbound lane as it traveled west for two more blocks.

Next, we consider defendant's contention that the convictions for speeding and driving in the wrong direction must be reversed because of defects in the charging instruments. Defendant first contends that the complaints charging those offenses (the traffic tickets) were unverified. We note that this contention is made only with respect to the traffic tickets. It does not apply to the aggravated battery, which was charged separately by information.

The evidence adduced at trial revealed that the traffic tickets had not, in fact, been sworn to under oath by Officer Pankow, despite the fact that each of the tickets bore a statement that it had been subscribed and sworn before the deputy clerk whose signature was on the ticket.

●4 It is well established that the right to be charged by a verified complaint is waived if defendant proceeds to trial without raising an objection. (*People v. Harding* (1966), 34 Ill. 2d 475, 482-83, 216 N.E.2d 147; *People v. Beardsley* (1985), 139 Ill. App. 3d 819, 830, 487 N.E.2d 731, *rev'd on other grounds* (1986), 115 Ill. 2d 47, 503 N.E.2d 346.) Defendant raised no objection until Officer Pankow's direct examination was completed. Moreover, section 111—3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/111—3(b) (West 1992)) provides that an unverified uniform ticket constitutes a complaint to which the defendant may plead unless the defendant specifically requests that a verified complaint be filed. Defendant made no request for verification of the traffic tickets at any time. Defendant argues that he could not have objected sooner because the complaints purport on their face to have been verified and defendant could not have known they were not actually verified until he questioned Officer Pankow about this fact on cross-examination. While it may be true that defendant could not have known beforehand that the complaints were unverified, we conclude that this defect was cured before the point at which defendant raised his objection.

In *People v. Bradford* (1975), 62 Ill. 2d 21, 338 N.E.2d 182, the Illinois Supreme Court considered a defendant's contention that a complaint charging prostitution was defective. The court wrote:

"The defendant contends that the complaint was defective because it was not verified by the person ostensibly presenting the complaint. (Ill. Rev. Stat. 1971, ch. 38, par. 111—3(b).) However, a sworn or verified complaint is not a jurisdictional prerequisite to the prosecution of a criminal offense and may be waived by a plea of guilty or by proceeding to trial without objection. [Citations.] The defense did not object to the complaint until its cross-examination of the State's complaining witness, that is, after the complainant-police officer had in open court testified under oath to all of the facts alleged in the complaint. We therefore find that the defendant by proceeding to trial without objecting or raising the question waived any defects that allegedly existed in the verification of the complaint." (*Bradford*, 62 Ill. 2d at 22.)

In *People v. Smith* (1967), 90 Ill. App. 2d 388, 234 N.E.2d 161, the defendant contended that his conviction should be reversed because of certain defects in verification of the complaint. The court, in affirming the conviction, stated:

"In the case on appeal the complaint purported to be verified. Defendant did not move to quash the complaint until after the State had rested its case. \*\*\* At the time of the motion the complainant had already sworn in open court to all the facts alleged in the complaint. We are constrained to hold that, no objection having been made in apt time, if any defects did in fact exist in the verification of the complaint, defendant is deemed to have waived them." *Smith*, 90 Ill. App. 2d at 394-95.

In the present case, as in *Bradford* and in *Smith*, defendant raised the objection to the defect in verification after the complainant, Officer Pankow, had already testified under oath to all of the facts alleged on the complaint. The effect was the same as if the State had been permitted to amend the complaint after an objection was raised during the trial. See *People v. Wallace* (1982), 106 Ill. App. 3d 580, 583, 435 N.E.2d 1322 (allowing amendment of unverified complaint was within trial court's discretion where amendment was only to provide verification and to correct statutory citation and the defense was not impaired because the basic charge had not been significantly altered). See also *Harding*, 34 Ill. 2d at 483 (State accorded opportunity to amend unverified traffic ticket).

Defendant also contends that the complaint for driving in the wrong direction was defective because it does not show the applicable subsection of the statute. The complaint describes the offense as "driving in the wrong direction in E/B lanes" and cites section 11—701 of the Illinois Vehicle Code. (625 ILCS 5/11—701 (West 1992).) The location is shown as "W/B 6000 blk. Lincoln." Section 11—701 of the Vehicle Code (625 ILCS 5/11—701 (West 1992)) has three

subsections. Subsection (a) requires that where a roadway is of sufficient width, a vehicle must be driven on the right half of the road. Subsection (b) requires vehicles traveling at less than normal speed of traffic to use the right-hand lane closest to the edge of the road. Subsection (c) provides that no vehicle may be driven to the left of the center line of a two-way road having four or more lanes.

●5 As we have stated with respect to the contention that the complaints were not verified, any objection to the sufficiency of a uniform traffic ticket must be raised before trial or it is waived. (*People v. Boras* (1990), 195 Ill. App. 3d 696, 700, 553 N.E. 2d 43; *People v. Schultz* (1988), 173 Ill. App. 3d 738, 742, 527 N.E.2d 984 ("absent a pretrial request for a bill of particulars or a pretrial objection to the sufficiency of a uniform traffic ticket, the ticket 'must be considered sufficient' ").) Moreover, this defect, unlike the defect involving verification, was apparent on its face when the ticket was issued.

The case of *People v. Sikes* (1986), 141 Ill. App. 3d 773, 491 N.E.2d 168, is on point. In that case, a traffic ticket charged defendant with an improper turn at a certain intersection "in violation of I.V.C. X, I.R.S. ____, Chap. ____, Sec. ____, Par. 11—801." (*Sikes*, 141 Ill. App. 3d at 774.) The court noted that section 11—801 contained several subsections, each of which prohibited slightly different conduct, such as an improper left turn versus an improper right turn. (*Sikes*, 141 Ill. App. 3d at 774.) As in the present case, the defendant in *Sikes* did not raise the issue before trial. The reviewing court stated that the failure to cite the applicable subsection or the direction in which the driver turned did not prevent him from preparing his defense because it was a detail which could have been ascertained by requesting a bill of particulars. (*Sikes*, 141 Ill. App. 3d at 777. See also *People v. Tammen* (1968), 40 Ill. 2d 76, 79, 237 N.E.2d 517.) In the present case, defendant could have raised an objection to the sufficiency of the ticket before trial or he could have requested a bill of particulars to provide additional details to aid in preparing his defense.

We next briefly address defendant's contention that the guilty verdict on the aggravated battery charge is inconsistent with the not guilty verdict returned on the charge of resisting arrest. See *People v. Frias* (1983), 99 Ill. 2d 193, 204, 457 N.E.2d 1233 (outright reversal rather than retrial necessary where offenses are legally inconsistent).

"Logical inconsistency between verdicts involves the acceptance and rejection of the same theory of the case for the State or the defense, and may exist between a conviction of one crime and an acquittal of another, where both arise out of the same facts but have different essential elements." (*People v. Cobbins* (1987), 162 Ill. App.

3d 1010, 1024, 516 N.E.2d 382.) Verdicts which are logically inconsistent can stand where there is, nonetheless, sufficient evidence to support the conviction. (*Cobbins*, 162 Ill. App. 3d at 1025; *Frias*, 99 Ill. 2d at 197. See also *People v. McClellan* (1992), 232 Ill. App. 3d 990, 1009, 600 N.E.2d 407.) The not guilty verdict may be an exercise of the jury's power of lenity because the jury believes that conviction of less than all the charges would result in sufficient punishment. *Cobbins*, 162 Ill. App. 3d at 1025. See also *People v. Sevier* (1992), 230 Ill. App. 3d 1071, 1085, 598 N.E.2d 968.

However, where a guilty verdict is legally inconsistent with a verdict of not guilty, the conviction must be reversed. (*Frias*, 99 Ill. 2d at 204.) "Verdicts of guilty of crime A but not guilty of crime B, where both crimes arise out of the same set of facts, are legally inconsistent when they necessarily involve the conclusion that the same essential element or elements of each crime were found both to exist and not to exist." *People v. Murray* (1975), 34 Ill. App. 3d 521, 531, 340 N.E.2d 186.

Defendant was charged with resisting arrest in violation of section 31—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 31—1), which reads, "A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer of any authorized act within his official capacity commits a Class A misdemeanor." The aggravated battery charge is based on section 12—4(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(b)(6)), which states that a person commits an aggravated battery who, in committing a battery, "[k]nows the individual harmed to be a peace officer *** engaged in the execution of any of his official duties including arrest or attempted arrest." A battery is committed when a person "intentionally or knowingly *** (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." Ill. Rev. Stat. 1989, ch. 38, par. 12—3.

In *People v. Miller* (1990), 199 Ill. App. 3d 603, 557 N.E.2d 500, this court found that although battery and resisting a police officer both require a "knowing" mental state, the knowledge element of battery differs from the knowledge element of resisting a peace officer. (*Miller*, 199 Ill. App. 3d at 607-08.) In comparing those two elements, we wrote that "a conscious awareness that one's conduct is practically certain to result in bodily harm, thereby resulting in a battery, is separate and distinct from a conscious awareness that that same conduct will impede or delay a peace officer from performing his duties." *Miller*, 199 Ill. App. 3d at 608. See also *People v. Picha* (1976), 44 Ill. App. 3d 759, 358 N.E.2d 937.

●6 Since an aggravated battery requires that a battery be committed, the same principle applies in the present case. One can intentionally harm a police officer without the knowledge that he is resisting arrest. Although there may be a logical inconsistency between the two verdicts, they are not legally inconsistent because aggravated battery and resisting arrest have different elements in that they require different mental states.

Next, there is no reason to dwell on defendant's contention of error regarding the trial court's exclusion of material from a learned treatise not disclosed during discovery. That treatise apparently would have extrapolated the rate of speed given in miles per hour into a rate of speed of feet per second to demonstrate that the officers would not have had sufficient time to accomplish the radar scanning of defendant's car after they first observed his vehicle.

●7 Clearly, the exclusion of this material by reason of defendant's failure to disclose the learned treatise during discovery was within the latitude of the trial court's discretion. (See *People v. Elworthy* (1991), 214 Ill. App. 3d 914, 925, 574 N.E.2d 727 (trial judge's decision to exclude evidence as discovery sanction should not be reversed absent abuse of discretion). Accord *People v. Tinoco* (1989), 185 Ill. App. 3d 816, 825, 541 N.E.2d 1198.) Moreover, as previously discussed, based upon the strength of the evidence concerning the defendant's speed, the exclusion of this treatise for purposes of cross-examination, even if erroneous, would not be prejudicial. See *Tinoco*, 185 Ill. App. 3d at 827 (court's imposition of discovery sanction upheld where defendant failed to show resulting prejudice).

Finally, we turn to the question of whether certain testimony of alleged prior misconduct by defendant was so prejudicial that it denied defendant his right to a fair trial. Defendant contends that the State's introduction of evidence of three incidents was highly prejudicial. The first of these is a battery allegedly committed by defendant against his former girl friend's father one week before the events giving rise to the present case. The charges were pending at the time of trial. Mention of this battery first occurred when Officer Jennetten testified for defense that defendant had a reputation as a peaceful person. On cross-examination, the State asked him, "Did you know that some time just before then that Mr. Wydra had been arrested for battery?" After a sidebar, the trial court sustained defendant's objection and instructed the jury to disregard the question. Later, during defendant's cross-examination, the trial court ruled that defendant could be asked questions about the battery. Defendant was asked if he recalled striking Lori's boyfriend with a board or biting him. Defendant replied that he did not recall these events.

The second related area of testimony occurred during Ms. Wydra's cross-examination. On direct examination defense counsel had elicited her testimony of a threat made against defendant by Lori's father. On cross-examination she testified that defendant first told her of this threat on the night Lori's father was arrested for attacking some of defendant's friends. The State then asked over defendant's objection, "And wasn't that after Mr. Johnson's house had been set on fire?" The trial court ruled in a sidebar that the State could go no further than asking Ms. Wydra why Mr. Johnson had threatened to kill defendant. No further mention was made of any fire.

The third incident involved defendant's allegedly circulating at Lori's place of employment a picture of her in which she was partially nude. We briefly discuss the context in which this evidence was introduced. On direct examination defendant's mother had testified that defendant had been depressed because of his breakup with Lori Johnson. The State asked her on cross-examination if defendant went to Lori's workplace and bothered her. Ms. Wydra replied, "I don't think so." Defendant's objection to that question was sustained after the witness had responded. During cross-examination of defendant, the State asked directly whether defendant told a man named Tom Adams that he intended to circulate in his girl friend's workplace a partially nude photograph of her. During a sidebar, the State contended that such testimony would show defendant had the capacity to formulate deliberate intent. The trial court ruled that the State could ask about the picture, although defendant had been found not guilty of obscenity charges in connection with it. The State then proceeded to elicit defendant's answer that he gave the picture to one of Lori's co-workers. The court admonished the jury that this testimony was admitted only for the purpose of showing defendant's state of mind. At defense counsel's prior request in sidebar, the trial court did not advise the jury of the obscenity charges or defendant's acquittal of those charges.

During closing argument, one of the prosecutors referred to this prior misconduct with great emphasis, stating:

"And do you remember something else very, very important? Ms. Winninger asked him about the picture of the girlfriend naked from the waist up. He denied any picture.

MR. COHEN: I object, your Honor.

THE COURT: Overruled.

MR. KLAPMAN: He denied any picture totally. What picture, what are you talking about? No. And then Ms. Winninger went on and said, didn't you go to her place of work and show the people the picture. He said no. I only showed it to one person at the place

of work. Well, now he is admitting to that, the fact there was that picture in question that he just, minutes before denied. He tripped himself up, and that's what cross-examination is. This shows you he is hiding things."

The State takes the position that all of the foregoing testimony and comment was admissible to show defendant's state of mind at the time of the police chase and attack on Officer Pankow. It argues that defendant opened the door to that testimony by eliciting testimony from all three officers, defendant, and his parents regarding defendant's behavior at the time of the attack and his depression in the preceding months.

Under Illinois law, the question to Officer Jennetten about whether he knew of the prior battery arrest is clearly improper. In *People v. Greeley* (1958), 14 Ill. 2d 428, 152 N.E.2d 825, the Illinois Supreme Court wrote, "we have consistently held it improper to permit a character witness to be cross-examined as to his own knowledge of particular acts of misconduct, [citations] rather, such interrogation must be confined to disparaging rumors and conversations which the witness has heard in the community and which negative the character sought to be established." (*Greeley*, 14 Ill. 2d at 432. See also *People v. Hunt* (1971), 132 Ill. App. 2d 314, 320, 270 N.E.2d 243.) The *Greeley* court also stated that, even where such testimony is later stricken, there may be reversible error, depending on the gravity of the mistake. (*Greeley*, 14 Ill. 2d at 433.) In *People v. Roberts* (1985), 133 Ill. App. 3d 731, 479 N.E.2d 386, in reversing a defendant's armed robbery conviction and remanding for a new trial where the State had asked character witnesses about their knowledge of a prior arrest for burglary, the court held "it is prejudicial error for the State to question a character witness regarding whether defendant had ever before been arrested." *Roberts*, 133 Ill. App. 3d at 739.

•8 The law concerning the inadmissibility of prior crimes and acts of misconduct is well established. Such evidence is inadmissible if used merely for the purpose of establishing defendant's propensity to commit a crime. (*People v. Thingvold* (1991), 145 Ill. 2d 441, 452, 584 N.E.2d 89.) "Such evidence overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving punishment." (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238.) However, such evidence may be admissible if relevant to establish a fact material to the prosecution, such as intent, identity, motive, *modus operandi*, or existence of a common design. (*People v. Stewart* (1984), 105 Ill. 2d 22, 62, 473 N.E.2d 840; *People v. McKibbons* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, *cert. denied*

(1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.) Evidence of another crime is admissible for such purposes only where there is sufficient similarity between the prior crime and the crime for which the defendant is being tried so that the evidence is relevant. *People v. Bartall* (1983), 98 Ill. 2d 294, 310, 456 N.E.2d 59; *McKibbons*, 96 Ill. 2d at 185-86.

In determining whether evidence of prior crimes is admissible for any purpose, the trial court must balance the relevancy of the evidence against its prejudicial effect. (*Thingvold*, 145 Ill. 2d at 452-53; *Stewart*, 105 Ill. 2d at 62.) Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Stewart*, 105 Ill. 2d at 62.

•9 The questions about defendant's alleged battery against his former girl friend's new boyfriend were not relevant to show any malice against, or intent to harm, Officer Pankow. Thus they are not relevant to demonstrate defendant's criminal intent. (See *People v. Lampkin* (1983), 98 Ill. 2d 418, 424-47, 457 N.E.2d 50; *People v. Robinson* (1989), 189 Ill. App. 3d 323, 335, 545 N.E.2d 268.) As for the dissemination of the girl friend's picture and the intimation that defendant was involved in an arson, there is no basis for making any connection between these acts and the crimes with which defendant was charged in this case. They are neither similar in nature nor sufficiently proximate in time to have any meaningful probative value whatsoever. See *Bartall*, 98 Ill. 2d at 310 (for evidence of other crimes to be admissible under one of the exceptions to the rule, the crime must have at least some general similarity to the crime for which the defendant is being tried).

The fact that defendant attempted to show he was in a distressed state of mind resulting from the breakup with a girl friend did not open the door to permit the State to flagrantly introduce the inflammatory and clearly irrelevant evidence as to defendant's prior acts of misconduct which may have occurred during that breakup. (See *People v. Thompkins* (1988), 121 Ill. 2d 401, 444, 521 N.E.2d 38, *cert. denied* (1988), 488 U.S. 871, 102 L. Ed. 2d 156, 109 S. Ct. 187; *People v. Coleman* (1991), 223 Ill. App. 3d 975, 999, 586 N.E.2d 270, *aff'd in part & rev'd in part* (1993), 155 Ill. 2d 507, 617 N.E.2d 1200.) The references by the State to those scandalous acts of misconduct did nothing to clarify or explain defendant's state of mind at the time of his encounter with Officers Pankow and Mahnke, other than to seriously disparage the character of defendant in the eyes of the jurors. We further note that defendant ultimately abandoned any defense of temporary insanity, necessity, or compulsion where defendant's state of mind, even at the time of his encounter with Officers Pankow and Mahnke, would have been in issue.

While the questions as to the alleged battery against Lori's new boyfriend and her father's house being set on fire did not result in damaging answers, the innuendo created by the State through the questions themselves was damaging. When added to the testimony about the partially nude picture of Lori which was independently inflammatory, the balance was tipped as to prejudicial effect.

The case of *People v. Lindgren* (79 Ill. 2d 129, 402 N.E.2d 238) is directly in point. In that case the State sought to introduce evidence of an arson in defendant's trial for armed robbery and murder. The State contended that defendant returned the gun he had used to the house and then set the house on fire to destroy the gun. A witness testified that defendant told her he set the fire to punish his wife for not being home. The court stated, "The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." (*Lindgren*, 79 Ill. 2d at 140.) The court noted that in determining whether the evidence was so prejudicial that it affected substantial rights of the defendant, "a conviction will be upheld only if the properly admitted evidence is so overwhelming that no fair minded jury could have voted for acquittal [citations] or, to put it another way, only if the record affirmatively shows that the error was not prejudicial." *Lindgren*, 79 Ill. 2d at 141.

We have already concluded that the properly admitted evidence in this case was sufficient to support the verdict of guilty of aggravated battery. However, the evidence was by no means overwhelming so as to withstand the impact of the prejudicial evidence of prior misconduct. As previously noted, no medical evidence was introduced to establish Officer Pankow's injury at defendant's hands, and the testimony of Officer Pankow was impeached by his failure to note his injuries in his report. Moreover, the lighting conditions in defendant's backyard were at best poor, and sufficient doubt may have been left in the minds of the jurors with respect to his identification of Pankow as a police officer, as opposed to being an intruder, to lead them to return a verdict of not guilty for resisting arrest. As noted earlier, the charge of aggravated battery under the statute was predicated upon the fact that the injury was inflicted upon a police officer. (See Ill. Rev. Stat. 1989, ch. 38, par. 12—4(b)(6).) Consequently, as discussed above, the finding by the jury that defendant was guilty of aggravated battery, while not legally inconsistent with the finding that he was not guilty of resisting arrest, nevertheless remains logically inconsistent and clearly not one predicated upon overwhelming support of the evidence.

On the other side of the ledger, the evidence of defendant's prior misconduct in this case charged him with the dissemination of his

girl friend's nude photograph at her workplace, an action certain to provoke a strong reaction of disdain and disapproval in the minds of jurors with normal sensitivities and values. The prosecutor, not content with the simple erroneous admission of these facts into evidence, proceeded in his closing argument, as set forth above, to give these acts special emphasis and focus and further elaborate repetition.

Accordingly, defendant's conviction for aggravated battery must be reversed and remanded for retrial. We note, however, that the introduction of this evidence does not mandate reversal of his convictions of the traffic offenses where the evidence was far more clear and explicit and where the jurors reflected no confusion or temerity in their findings.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed as to the convictions for speeding and driving in the wrong direction. The judgment is reversed and the cause is remanded for new trial on the charge of aggravated battery with the caveat, however, that if the defendant has already completed his term of probation, no purpose would be served by any retrial.

Affirmed in part; reversed and remanded in part.

MURRAY, P.J., and COUSINS, J., concur.